STATE OF CONNECTICUT *v.* PERRY LEE HERRING
(13238)

PETERS, C. J., CALLAHAN, GLASS, COVELLO and HULL, Js.

Argued December 7, 1988—decision released February 14, 1989

*Jon L. Schoenhorn,* with whom, on the brief, was *Sharon M. Elias,* law student intern, for the appellant (defendant).

*Timothy J. Sugrue,* deputy assistant state's attorney, with whom, on the brief, was *Herbert G. Appleton,* assistant state's attorney, for the appellee (state).

PETERS, C. J. The Interstate Agreement on Detainers (IAD), is designed to encourage the expeditious and orderly disposition of criminal charges pending in one state against a prisoner incarcerated in another state. General Statutes § 54-186, Article I.[1] The principal issue before us is whether an unreasonable delay by the custodial state in notifying a prisoner of outstanding detainers,[2] and in processing his request for their

[1] General Statutes § 54-186, Article I provides: "The party states [joining in the Agreement on Detainers] find that charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party states and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints. The party states also find that proceedings with reference to such charges and detainers, when emanating from another jurisdiction, cannot properly be had in the absence of cooperative procedures. It is the further purpose of this agreement to provide such cooperative procedures."

The IAD has been adopted by forty-eight states, the District of Columbia, Puerto Rico, the Virgin Islands, and the United States. *Carchman* v. *Nash,* 473 U.S. 716, 719, 105 S. Ct. 3401, 87 L. Ed. 2d 516 (1985). In New Jersey, it is codified as N.J. Stat. Ann. § 2A:159A-1 et seq. (West 1985).

[2] A detainer is a notification advising an institution in which a prisoner is serving a sentence that the prisoner is wanted to face pending criminal charges in another jurisdiction. *Carchman* v. *Nash,* 473 U.S. 716, 719, 105 S. Ct. 3401, 87 L. Ed. 2d 516 (1985); *Cuyler* v. *Adams,* 449 U.S. 433, 436

prompt disposition, unconditionally requires that the demanding state discharge any informations on which the detainers were based. In this case, prosecutorial authorities in Connecticut lodged two detainers based on untried murder informations against the defendant, Perry Lee Herring, who was then incarcerated in New Jersey. As amended at trial, the first information accused him, in two counts, of having committed the crimes of murder and conspiracy to commit murder, in violation of General Statutes §§ 53a-54a and 53a-48 (a),[3] in connection with the death of Henry J. "Rico" Littman. The second amended information, also in two counts, accused him of having committed the crimes of murder and felony murder, in violation of General Statutes §§ 53a-54a and 53a-54c,[4] in connection with the death of Donald Gore. Over the defendant's objection, the two informations were consolidated for trial. After a jury trial, the defendant was found guilty of felony murder in connection with Gore's death and of being an accessory to the murder of Littman. He appeals from the judgment of the trial court ordering him to serve a total effective sentence of fifty years to life.

---

n.3, 101 S. Ct. 703, 66 L. Ed. 2d 641 (1981); *United States* v. *Mauro,* 436 U.S. 340, 359, 98 S. Ct. 1834, 56 L. Ed. 2d 329 (1978); *State* v. *Braswell,* 194 Conn. 297, 300 n.1, 481 A.2d 413 (1984), cert. denied, 469 U.S. 1112, 105 S. Ct. 793, 83 L. Ed. 2d 786 (1985).

[3] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[4] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime . . . he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

The defendant has raised six issues on his appeal. He maintains that the trial court erred in: (1) denying his motion for dismissal of the charges despite unexcused delay in the custodial state's processing of his request for final disposition of the detainers lodged against him; (2) denying his motion for severance of the two murder charges; (3) locking the courtroom during delivery of the court's instructions to the jury; (4) failing to instruct the jury on a lesser included charge of manslaughter on the Littman murder; (5) instructing the jury on remarks of the defense counsel; and (6) limiting the defendant's cross-examination of a witness. We find no error.

I

The defendant claims that Connecticut's enactment of the IAD mandates this state's dismissal of the criminal charges lodged against him because, in New Jersey, where he was incarcerated, prison officials unreasonably delayed both in providing him with IAD forms requesting final disposition of the charges covered by these detainers and in forwarding his request to Connecticut. Because officials of New Jersey, the custodial state, "act as agents of the demanding state for purposes of the IAD"; *State* v. *Braswell,* 194 Conn. 297, 305, 481 A.2d 413 (1984), cert. denied, 469 U.S. 1112, 105 S. Ct. 793, 83 L. Ed. 2d 786 (1985); their delay, according to the defendant, required dismissal of the Connecticut murder charges against him.

A

The facts underlying the defendant's claim are undisputed. On February 28, 1986, a New Jersey court convicted, sentenced and immediately imprisoned the defendant for a crime committed in that state. Aware of pending Connecticut charges, the defendant, in early April, 1986, forwarded to the appropriate prison offi-

cials at Trenton, where he was then imprisoned, his request for a speedy disposition of these detainers. Although the New Jersey officials duly contacted the Connecticut authorities to inquire about outstanding charges and, in timely fashion, received the necessary information from Connecticut, the prison authorities failed to provide the relevant official IAD forms to the defendant until August 18, 1986, some four months after his initial inquiry. Part of this delay was attributable, the trial court found, to the fact that an outstanding misdemeanor charge in New Jersey was not disposed of until June 16, 1986. Even if the New Jersey charge had to be resolved before the defendant could be tried in Connecticut; General Statutes § 54-186, Article VI (a); *United States* v. *Mason,* 372 F. Sup. 651, 653–54 (N.D. Ohio 1973);[5] there remained an unexcused period of two months in providing the defendant with the official forms.

Within eight days of their belated forwarding of the official forms to the defendant, the New Jersey prison officials received them back, appropriately completed. After another delay of four months, these officials forwarded the defendant's request for speedy disposition of charges to Connecticut.[6]

Connecticut authorities received notification of the defendant's request on November 21, 1986. He was brought to trial 109 days later, on March 9, 1987. The defendant filed a motion, in the trial court in this state,

[5] General Statutes § 54-186, Article VI (a) provides: "In determining the duration and expiration dates of the time periods provided in articles III and IV of this agreement, the running of said time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter."

[6] Deborah Hansen, deputy compact administrator and Chief of the Office of Interstate Services for the New Jersey Department of Corrections, testified that the processing of the defendant's request for prompt disposition of his Connecticut detainers was "untimely" and "unacceptable."

for dismissal of the charges against him because of alleged violations of Article III of the IAD. In accordance with our holding in *Giardino* v. *Bourbeau,* 193 Conn. 116, 126, 475 A.2d 298 (1984), only a court in this state, where the underlying charges had been filed, had the power to consider their dismissal. After a hearing, the trial court held that the prosecuting authorities in Connecticut had complied with the requirement of Article III (a) of the IAD that a prisoner be tried "within one hundred eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction . . . his request for a final disposition to be made of the indictment, information or complaint . . . ." General Statutes § 54-186, Article III (a). The court further found that, although the New Jersey prison officials had concededly delayed in complying with the requirements of subsections (b), (c) and (d) of Article III of the IAD, their delay had "resulted from clerical inattention . . . because of budget restrictions [that caused] backlogs in the New Jersey correction system." Under these circumstances, the court concluded that the actions taken in New Jersey were "as prompt as necessary" under the IAD.

B

The defendant makes a three part claim in support of his contention that the trial court erred in failing to dismiss the informations against him because of the extensive delays of the New Jersey prison authorities in processing his IAD request for prompt disposition of his Connecticut charges. First, he claims that the trial court erred in failing to hold that the New Jersey authorities had a duty to inform him of the detainers lodged against him immediately upon his incarceration in February, 1986, rather than after disposition of his remaining New Jersey charge in June, 1986. Second, although he does not contest the trial court's factual

finding that any delay by the New Jersey prison authorities resulted from clerical inadvertance and systemic backlogs, he challenges the court's legal conclusion that such conduct complied with IAD requirements for prompt action by custodial authorities. Third, he maintains that, because of the overall delays that occurred in his effort to secure prompt disposition of his Connecticut charges, the trial court erred in failing to dismiss the charges against him. In our view of this case, we need not resolve the first of these claims, because the delays that ensued in New Jersey after June, 1986, were sufficiently egregious to trigger an inquiry into whether dismissal of the defendant's Connecticut charges was required. We conclude nonetheless that, in the circumstances of this case, the trial court was justified in not ordering such dismissals.

A review of the legal principles that govern the IAD is necessary to provide a context for the defendant's claims. Because the IAD is an interstate compact that the federal Congress has sanctioned, we must interpret its provisions in accordance with federal law. *Carchman* v. *Nash,* 473 U.S. 716, 719, 105 S. Ct. 3401, 87 L. Ed. 2d 516 (1985); *Cuyler* v. *Adams,* 449 U.S. 433, 438, 442, 101 S. Ct. 703, 66 L. Ed. 2d 641 (1981); *State* v. *Braswell,* supra, 304. In searching for the applicable federal law, we may, however, look to relevant decisions in both federal and state courts. *State* v. *Braswell,* supra.

Article III of the IAD governs inmate requests for a prompt disposition of outstanding detainers. The centerpiece of Article III is subsection (a), which states that a prisoner "shall be brought to trial within one hundred eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment,

information or complaint . . . . " General Statutes § 54-186, Article III (a). Failure to comply with Article III (a) mandates dismissal with prejudice of the underlying charges. General Statutes § 54-186, Article V (c);[7] *United States* v. *Mauro,* 436 U.S. 340, 364–65, 98 S. Ct. 1834, 56 L. Ed. 2d 329 (1978). In *State* v. *Braswell,* supra, 305, we interpreted the 180 day provision to require the demanding state to "bring the prisoner to trial within 180 days of the date on which the demanding state *receives* the prisoner's request for final disposition and notice of place of imprisonment." (Emphasis added.) The trial court therefore correctly held that the prosecutorial authorities in this state had complied with the 180 day requirement of Article III (a) by bringing the defendant to trial within 109 days of the time that Connecticut authorities received notification of the defendant's request for prompt disposition.

The remaining provisions of Article III address the custodial state's duty "promptly" to inform a prisoner of outstanding detainers; General Statutes § 54-186, Article III (c);[8] and "promptly" to forward a request for prompt disposition to the demanding state. General Statutes § 54-186, Article III (b) and (d).[9] New Jer-

---

[7] General Statutes § 54-186, Article V (c) provides: "If the appropriate authority shall refuse or fail to accept temporary custody of said person, or in the event that an action on the indictment, information or complaint on the basis of which the detainer has been lodged is not brought to trial within the period provided in article III or article IV hereof, the appropriate court of the jurisdiction where the indictment, information or complaint has been pending shall enter an order dismissing the same with prejudice, and any detainer based thereon shall cease to be of any force or effect."

[8] General Statutes § 54-186, Article III (c) provides: "The warden, commissioner of correction or other official having custody of the prisoner shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final dispositon of the indictment, information or complaint on which the detainer is based."

[9] General Statutes § 54-186, Article III (b) and (d) provide in relevant part: "(b) The written notice and request for final disposition . . . shall be given

sey's compliance with these provisions is called into question by the failure of New Jersey prison authorities to provide the defendant with IAD forms for at least two months after he had requested them, and to forward them to Connecticut only after the lapse of another four months. Even if these delays resulted from "clerical inattention" attributable to "budgetary restrictions," as the trial court found, a total delay of six months cannot readily be reconciled with a statutory requirement for "prompt" notification of the relevant parties.

The state responds to these serious departures from IAD standards by pointing to the speedy disposition that the defendant's case received in this state. The state reminds us that, because the defendant's trial began on March 9, 1987, he was actually tried within 266 days after June 16, 1986, the date when Connecticut should have received notification of his IAD request. From that time, the state would exclude 68 days that it claims were attributable to defense-engendered delays. If those exclusions were appropriate, which the defendant contests, the defendant would have been confronted with no more than a 198 day interval to trial, and only a residue of eighteen days over the permitted 180 day period, despite the clerical inattention that his IAD request received in New Jersey. An eighteen day delay, the state maintains, is "minimal" and does not violate the purpose for which the IAD was enacted.

or sent by the prisoner to the warden, commissioner of correction or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested. . . .

"(d) . . . . The warden, commissioner of correction or other official having custody of the prisoner shall forthwith notify all appropriate prosecuting officers and courts in the several jurisdictions within the state to which the prisoner's request for final disposition is being sent of the proceeding being initiated by the prisoner. . . ."

We are disinclined to untangle the logic underlying the state's arithmetic, in the absence of specific trial court findings relating thereto. More fundamentally, the state's analysis is difficult to reconcile with our holding in *State* v. *Braswell,* supra, that the 180 day period of Article III (a) did not commence until the date on which Connecticut authorities received the defendant's request for final disposition of the charges against him. *State* v. *Braswell* interprets the IAD as separating the very elements that the state's argument would have us commingle.

Even if we are thus forced to conclude, contrary to the holding of the trial court, that the six month delay that the defendant encountered in New Jersey violated subsections (b), (c) and (d) of Article III, that conclusion does not end the matter. Examination of the IAD discloses that the remedy of dismissal of criminal charges is mandated only under certain specifically defined circumstances, such as a demanding state's refusal or failure to accept temporary custody of a prisoner, or a demanding state's failure to comply with the 180 day provision of Article III (a). See General Statutes § 54-186, Article V (c).[10] Delays in the processing of IAD forms by prison authorities in the custodial state do not fall within the express terms of subsection (c) of Article V. See *People* v. *Zetsche,* 188 Cal. App. 3d 917, 925, 233 Cal. Rptr. 720 (1987); *Sweaney* v. *District Court,* 713 P.2d 914, 918 (Colo. 1986); *Coit* v. *State,* 440 So. 2d 409, 412 (Fla. App. 1983); *State* v. *Clark,* 222 Kan. 65, 68–69, 563 P.2d 1028 (1977); *State* v. *Reynolds,* 218 Neb. 753, 761–62, 359 N.W.2d 93 (1984); *Commonwealth* v. *Gonce,* 320 Pa. Super. 19, 28, 466 A.2d 1039 (1983); *State* v. *Barefield,* 47 Wash. App. 444, 456, 735 P.2d 1339 (1987); contra *Stroble* v. *Anderson,* 587 F.2d 830, 839–40 (6th Cir. 1978); *People* v. *Office,*

[10] See footnote 7, supra.

126 Mich. App. 597, 603–604, 337 N.W.2d 592 (1983); *State* v. *Johnson,* 278 S.C. 668, 669, 301 S.E.2d 138 (1983); *State* v. *Gipson,* 670 S.W.2d 637, 639 (Tenn. Crim. App. 1984); see also 2 W. LaFave & J. Israel, Criminal Procedure (1984) § 18.4, p. 422; L. Abramson, Criminal Detainers (1979) p. 100.[11]

Although custodial state delays do not automatically require the dismissal of criminal charges in the demanding state, we would be remiss in our obligation to effectuate the IAD's purposes and principles if we were simply to ignore such a violation. Indeed, as we have noted earlier, under the IAD, officials of the custodial state act as the agents of the demanding state. *State* v. *Braswell,* supra, 305; *Giardino* v. *Bourbeau,* supra, 126. When, in somewhat similar circumstances, we sought to enforce a criminal defendant's right to have his appeal defended by the state with due diligence; *State* v. *Files,* 183 Conn. 586, 588–89, 441 A.2d 27 (1981); we found a useful analogy in the rules that have been developed to protect a defendant's constitutional right to a speedy trial. So too this defendant's right to prompt IAD notification can appropriately be protected by invoking the balancing principles of *Barker* v. *Wingo,* 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), which determine when a deprivation of speedy trial rights requires dismissal of criminal charges against a defendant.

Applying the principles of *Barker* v. *Wingo,* supra, to the facts of this case, we are persuaded that the trial court correctly denied the defendant's motion to dismiss the criminal charges against him. The four factors that form the matrix of a *Barker* v. *Wingo* analysis

---

[11] *United States* v. *Roy,* 771 F.2d 54 (2d Cir. 1985), cert. denied, 475 U.S. 1110, 106 S. Ct. 1520, 89 L. Ed. 2d 918 (1986), on which the defendant puts special emphasis, is inapposite because it concerns a violation of Article IV and not of Article III of the IAD.

are: the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. Id., 530; *State* v. *Flowers,* 198 Conn. 542, 543–44, 503 A.2d 1172 (1986); *State* v. *Lloyd,* 185 Conn. 199, 208, 440 A.2d 867 (1981). Although the six month delay in New Jersey was sufficient to trigger further inquiry, and although the defendant asserted his IAD rights in timely fashion, the reason for the delay has been found to have been a bureaucratic backlog attributable to fiscal problems, rather than official intransigeance. As in *State* v. *Flowers,* supra, 547–51, although such a reason is not a total excuse, it is at least a neutral factor that does not weigh heavily against the state. *Flowers* v. *Warden,* 853 F.2d 131, 134 (2d Cir.), cert. denied, 488 U.S. , 109 S. Ct. 563, 102 L. Ed. 2d 588 (1988); *State* v. *Gasparro,* 194 Conn. 96, 100, 480 A.2d 509 (1984), cert. denied, 474 U.S. 828, 106 S. Ct. 90, 88 L. Ed. 2d 74 (1985). Finally, the sole evidence of prejudice, a factor to which we have always assigned special importance; see, e.g., *State* v. *Flowers,* supra, 551; *State* v. *Morrill,* 197 Conn. 507, 526, 498 A.2d 76 (1985); *State* v. *Lloyd,* supra, 209; came from the state and indicated that the conditions of the defendant's incarceration in New Jersey had not been adversely affected by the delay in bringing the defendant to trial.[12] In its totality, this record did not require dismissal of this defendant's criminal charges.

---

[12] Deborah Hansen, the deputy compact commissioner for the New Jersey Department of Corrections, testified affirmatively that the defendant, as a prisoner with a sentence of eighteen years, would not have been eligible for work release, reduced custody or parole during the period when his Connecticut detainers were outstanding. She also testified that the particular work to which a prisoner might be assigned at the Trenton state prison would not be affected by the existence of any outstanding detainers. The force of this testimony is not significantly diminished by the witness' unwillingness to state, on cross-examination, that she could "preclude" the possibility that an outstanding murder detainer might have an effect on a classification department's decision about where to send a particular inmate.

## II

The defendant next claims that the trial court erred in trying jointly the two murder informations pending against him. The state initially charged the defendant with murder and felony murder in connection with the April 16, 1981 death of Donald Gore, and, in a separate information, with murder in connection with the May 15, 1981 death of Henry J. "Rico" Littman. The trial court, in the absence of an objection by the defendant, granted the state's motion for consolidation on March 9, 1987. It was only when the state thereafter filed an amended information, adding a count of conspiracy to commit murder in the Littman case, that the defendant objected, first to the amendment,[13] and then to the joinder. In support of this belated objection to joinder, manifested by a motion to sever, the defendant noted that until that point he had known of only one adverse witness for both charges (Loretta Swain), but that the new conspiracy charge, added in violation of his due process rights, would enable the state to present additional witnesses who would bolster Swain's credibility. The trial court denied the motion to sever, to which the defendant took exception.

## A

The jury could reasonably have found the following facts with regard to the death of Gore. On April 16, 1981, the Hartford police discovered a white van that had crashed into the side of a garage in the vicinity of 138 Evergreen Street. In the van, between the seat and

---

[13] The defendant objected to the amendment on the grounds that it would be unduly prejudicial, on the day of trial, to "suddenly have to investigate a whole slew of witnesses who are unknown to Mr. Herring or to the defense." Nonetheless, the trial court denied the defendant's motion to strike or dismiss the additional count. The defendant has not assigned error to that ruling in this appeal.

the motor casing, lay the body of a white male, later identified as that of Donald Gore. An autopsy determined that Gore had died from gunshot wounds penetrating several vital organs. Several items found in the van were determined to belong to Loretta Swain. Swain was a primary suspect in the shooting, but Hartford police had been unsuccessful in obtaining a warrant for her arrest on murder charges. In August, 1985, Swain went to the Hartford police with information about the Gore shooting. Relying on Swain's statements to them, the state charged the defendant with murder and felony murder in connection with Gore's death.

From Swain's testimony at the defendant's trial, the jury could have found that Swain, until recently the defendant's girlfriend, had made her living by shoplifting and prostitution. On the night of the shooting she was in a Hartford bar with the defendant when she observed Gore, whom she knew professionally. She told the defendant that she knew Gore and could obtain money from him. The defendant then suggested that she meet Gore in the rear parking lot at 145 Sisson Avenue so that he could "stick the guy up" while Gore was undressed. She met Gore in his van as planned. The defendant then came to the car window with a gun and announced, "Yo, this is a stick-up." When Gore started the van and attempted to drive away, the defendant fired several shots at him. Swain then jumped from the van while it was moving and ran with the defendant into the building at 145 Sisson Avenue in which the defendant's aunt lived. While running from the van, Swain dropped her pocketbook, which contained several personal items that she identified as among those the police had collected at the crime scene. Both she and the defendant left for New York, New York, a few days later.

The defendant was further implicated in the Gore murder by Graylon Shannon, a convicted felon, who testified that, while he and the defendant were at the Hartford Correctional Center, the defendant admitted that he had shot Gore during a holdup. An eyewitness, Edward Condon, testified that his yard overlooked the parking lot at 145 Sisson Avenue, and that, on April 16, 1981, at approximately 9:15, he had heard tires screech, an engine accelerating and a number of shots and had seen a van heading south through the parking lot. He observed only one individual hanging from the van's passenger door, whom he described as a white man of medium build, between five and one-half to six feet tall with long stringy hair, who subsequently jumped from the van and ran toward the building.

With regard to the Littman shooting, the jury could reasonably have found the following facts. On May 15, 1981, Hartford police found a body in the trunk of a vehicle parked in a cemetery near Cleveland Avenue Extension. The head of the deceased had been wrapped in a black plastic bag and his hands had been tied. Police later identified the body as that of Henry J. "Rico" Littman and an autopsy showed that he had died from a shotgun wound to the head.

In August, 1985, at the same time that she offered information about the Gore shooting, Swain also implicated the defendant in the Littman killing. Swain testified at trial that the defendant, Littman and Henry "Boo" Robinson had robbed a bank, and that during the course of the robbery Littman's face was uncovered. Fearing that Littman would be identified and would then turn them in, Robinson and the defendant decided that "they had to get rid of" Littman.

Glenda Hightower, Robinson's former girlfriend, testified that in March, 1981, she too had heard the defendant tell Robinson that Littman had "to go" because the

bank's cameras had most likely captured his face on film, and that Robinson had agreed. She also heard the two discuss the possibility that Littman might turn them in.

T.J. Thomas testified that, on the morning of May 15, 1981, he had seen Robinson and another man pass him in the same car in which Littman's body was found. The two then got out of the car and ran away. Shannon also testified that the defendant had admitted that he had participated in the Littman killing to the extent of carrying the body to the car and driving to the cemetery.

## B

General Statutes § 54-57[14] and Practice Book § 829[15] authorize a trial court to order a defendant to be tried jointly on charges arising separately. In deciding whether to sever informations joined for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. *State* v. *Greene,* 209 Conn. 458, 463, 551 A.2d 1231 (1988); *State* v. *Pollitt,* 205 Conn. 61, 67–68, 530 A.2d 155 (1987); *State* v. *Boscarino,* 204 Conn. 714, 720–21, 529 A.2d 1260 (1987); *State* v. *Bell,* 188 Conn. 406, 410–11, 450 A.2d 356 (1982); *State* v. *King,* 187 Conn. 292, 299, 445 A.2d 901 (1982); *State* v. *Jonas,* 169 Conn. 566, 570, 363 A.2d 1378 (1975), cert. denied, 424 U.S. 923, 96 S. Ct. 1132, 47 L. Ed. 2d 331 (1976). The

---

[14] "[General Statutes] Sec. 54-57. JOINDER OF OFFENSES OF THE SAME CHARACTER. Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise."

[15] "[Practice Book] Sec. 829. TRIAL TOGETHER OF INDICTMENTS OR INFORMATIONS

"The judicial authority may, upon his own motion or the motion of any party, order that two or more indictments or informations or both, whether against the same defendant or different defendants, be tried together."

defendant bears a heavy burden of showing that the " 'denial of severance resulted in substantial injustice,' and that any resulting prejudice was 'beyond the curative power of the court's instructions.' " *State* v. *Boscarino,* supra, 721, quoting *State* v. *King,* supra, 302; *State* v. *Silver,* 139 Conn. 234, 240, 93 A.2d 154 (1952).

This court recently reexamined the undeniable tension between the need to conserve judicial resources by consolidating cases and the defendant's right to a fair trial. In *State* v. *Boscarino,* supra, 721, we held that the trial court had erred in joining four separate counts of sexual assault in the first degree against the defendant because the joinder worked a " 'substantial injustice' . . . 'beyond the curative power of the court's instructions.' " We there discussed several factors that a trial court should consider in making its determination whether severance is required in order to avoid the "omnipresent risk . . . that 'although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all.' *United States* v. *Lotsch,* 102 F.2d 35, 36 (2d Cir.), cert. denied, 307 U.S. 622, 59 S. Ct. 793, 83 L. Ed. 1500 (1939)." *State* v. *Boscarino,* supra, 721–22. These factors include: (1) whether the charges involved "discrete, easily distinguishable factual scenarios"; (2) whether the crimes were of a "violent nature" or concerned "brutal or shocking conduct" on the defendant's part; and (3) the "duration and complexity of the trial." Id., 722–23. We held that if any or all of these factors were present, a reviewing court would have to decide whether the trial court's jury instructions cured any prejudice that might have occurred. Id., 724.[16]

---

[16] We disagree with the state's contention that we should limit our review of this claim because the defendant failed to raise any of the specific *Boscarino* factors as grounds for severance at the trial. *State* v. *Boscarino,*

We conclude that this case does not involve the high risk of confusion and prejudice that were present in *Boscarino*. That case involved four sexual assaults, within a few months of each other, in which the assailant carried a knife and was reportedly naked. The details of two of the assaults were of such a violent and shocking nature, both in regard to physical violence and sexual derangement, as impermissibly to increase the risk of inflaming the jury. Finally, the *Boscarino* trial lasted ten weeks, during which time the jury had heard testimony from fifty-five witnesses and examined sixty-six exhibits.

In contrast, the present case involves two killings that were not strikingly similar but instead involved "discrete, easily distinguishable factual scenarios."[17] Gore was killed while attempting to flee in his van from an alleged robbery. Littman, on the other hand, was shot and killed and left in the trunk of a car after he had allegedly helped the defendant and Robinson rob a bank. The two victims were shot in different parts of their bodies, and died of wounds to different organs.

---

204 Conn. 714, 722–24, 529 A.2d 1260 (1987). Despite the general rule that "this court will not consider claimed errors on the part of the trial court unless there has been a compliance with the provisions of § 652 [now § 4185] of the Practice Book"; *State* v. *Evans,* 165 Conn. 61, 67, 327 A.2d 576 (1973); that rule cannot foreclose a review in the present circumstances. Several of the factors that we stressed in *State* v. *Boscarino* require hindsight in determining whether the defendant received a fair trial. While it may be relevant to consider whether the defendant raised the question of prejudice at trial or requested appropriate curative instructions, the effect of a denial of severance may be difficult to predict in advance of the actual testimony at trial.

[17] The state concedes that, unlike the case of *State* v. *Pollitt,* 205 Conn. 61, 70, 530 A.2d 155 (1987), the two crimes with which this defendant was charged were not "signature offenses," i.e., the state would not have been able to introduce evidence of either murder in the trial of the other, if the two informations had been tried separately. However, "[s]ubstantial prejudice does not necessarily result from a denial of severance even where evidence of one offense would not have been admissible at a separate trial involving the second offense." Id., 68.

While any murder involves violent and upsetting circumstances, it would be unrealistic to assume that any and all such deaths would inevitably be so "brutal and shocking" that a jury, with proper instructions to treat each killing separately, would necessarily be prejudiced by a joint trial. Further, in this case, the jury heard only eight days of testimony with twenty-three witnesses taking the stand. The complexity and risk of confusion in this trial did not approach that involved in *Boscarino*.[18]

Finally, although " 'a curative instruction is not inevitably sufficient to overcome the prejudicial impact of [inadmissible other crimes] evidence' "; *State* v. *Boscarino,* supra, 724–25, quoting *State* v. *Tinsley,* 180 Conn. 167, 170, 429 A.2d 848 (1980); where the likelihood of prejudice is not overwhelming, such curative instructions may tip the balance in favor of a finding that the defendant's right to a fair trial has been preserved. In this case the trial court, on three separate occasions, admonished the jury to keep the informations separate: during voir dire, during the trial, and finally during its jury charge. We conclude that the court's charge properly cured any risk of prejudice caused by the joinder of the informations.

The fact that the defendant did not initially object to the joinder supports our conclusion that the joinder of the two murder cases was not inherently or substantially prejudicial. Indeed, when the defendant finally did move to sever the informations, he relied on evidentiary factors relating to the enhanced credibility of a principal witness against the defendant, rather than on the risk that a joint trial would engender juror confusion and prejudice. Bearing in mind that whether " 'a

---

[18] While the state introduced about the same number of exhibits herein as it had in the *Boscarino* trial, many of the exhibits were photographs of the murder sites and thus were relatively easy for the jury to keep straight. *State* v. *Boscarino,* 204 Conn. 714, 529 A.2d 1260 (1987).

joint trial will be substantially prejudicial to the rights of the defendant . . . means something more than that a joint trial will be less advantageous to the defendant' ''; *State* v. *Bell,* supra, 411; *State* v. *Silver,* supra, 240; *State* v. *McCarthy,* 130 Conn. 101, 103, 31 A.2d 921 (1943); we conclude that the trial court did not abuse its discretion in denying the defendant's motion.

## III

The defendant's third claim is that, in closing the courtroom during its jury instructions, the trial court violated his sixth amendment right to a fair and public trial.[19] U.S. Const., amend. VI. Before instructing the jury, the trial court directed the sheriff to lock the courtroom doors and to post a "Do Not Enter" sign. The trial court overruled the defendant's objections to its actions and noted the defendant's exception.

A defendant unquestionably has a right to a public trial, a right well rooted in our common law as well as in the sixth amendment to the United States constitution; *Waller* v. *Georgia,* 467 U.S. 39, 46–47, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984); as applied to the states through the fourteenth amendment. *Duncan* v. *Louisiana,* 391 U.S. 145, 148, 88 S. Ct. 1444, 20 L. Ed. 2d 491, reh. denied, 392 U.S. 947, 88 S. Ct. 2270, 20 L. Ed. 2d 1412 (1968); see also *Richmond Newspapers, Inc.*

---

[19] The defendant also invokes article first, § 8, of the Connecticut constitution, but does not advance any arguments supporting a separate treatment of his claim under the state constitution. Accordingly we need consider only his federal constitutional claim. See *State* v. *Mercer,* 208 Conn. 52, 67 n.9, 544 A.2d 611 (1988); *State* v. *Chung,* 202 Conn. 39, 45 n.7, 519 A.2d 1175 (1987). The defendant's citation to *State* v. *Sheppard,* 182 Conn. 412, 415, 438 A.2d 125 (1980), does not convince us otherwise. In *Sheppard* we held that the trial court's closure of the trial during the testimony of two witnesses, absent a showing of a compelling need by the state, violated the defendant's right to a public trial under the provisions of the sixth and fourteenth amendments to the United States constitution and under article first, § 8, of the Connecticut constitution. We did not indicate that these constitutional provisions were anything but coextensive for these purposes.

v. *Virginia,* 448 U.S. 555, 566–70, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980). Openness "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enterprise Co.* v. *Superior Court of California,* 464 U.S. 501, 508, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984). Thus, a court's power to order a closure of the courtroom should "be sparingly exercised, and limited to those situations where closure is demonstrably necessary to further the administration of justice." *State* v. *Sheppard,* 182 Conn. 412, 416, 438 A.2d 125 (1980); *State* v. *Frazier,* 185 Conn. 211, 231, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982). In this case, however, we do not agree that a "closure" of the courtroom occurred.

As the trial court informed the defendant, its purpose in directing a temporary closing of the courtroom door was "not to disturb the contact of the judge to the jury, and the jury listening to the judge giving instructions." Because those then present in the courtroom were not excluded from witnessing the proceedings, the defendant's trial remained a public one throughout.[20]

Although we recognize that courts in other jurisdictions are divided on the issue, we agree with the more recent cases that, in similar circumstances, have found no closure of the court implicating the sixth amendment. *Renfroe* v. *State,* 49 Ala. App. 713, 275 So. 2d 692 (1973); *People* v. *Buck,* 46 Cal. App. 2d 558, 116 P.2d 160 (1941); *People* v. *Bails,* 163 Mich. App. 209, 413 N.W.2d 709 (1987); see also *People* v. *Colon,* 71

[20] The trial court stated: "The hearing is still public. If people want to come in prior to the start of instructions, they are permitted. But to distract—to have suddenly a group come in, that distracts the jurors from what the judge is instructi[ng], and results in the jury not getting everything and having to then ask again to be instructed."

N.Y.2d 410, 521 N.E.2d 1075, 526 N.Y.S.2d 932, cert. denied, 487 U.S. 1239, 108 S. Ct. 2911, 101 L. Ed. 2d 943 (1988). We find especially instructive the opinion of the New York Court of Appeals in *People* v. *Colon,* supra. *Colon,* like our case, involved a trial court's locking the courtroom doors during jury instructions. The Court of Appeals noted there that "[u]nlike orders explicitly excluding members of the public, the trial court's action here does not explicitly exclude anybody and is designed solely to regulate the ingress and egress of the spectators. The right to a public trial has always been recognized as subject to the inherent power of trial courts to administer the activities of the courtroom . . . . Locking the doors during the charge to avoid disruption—allowing those already present to remain—does not seek to exclude the public or frustrate the salutary purposes of public scrutiny." Id., 416. Accordingly, we conclude that the trial court did not violate the defendant's constitutional right to a public trial.

## IV

The defendant's fourth claim is that the trial court violated his right to a fair and impartial jury by instructing the jury to disregard portions of his counsel's summation as "improper" and by conditioning credit of his argument on two questions raised by the trial court. The defendant maintains that the court's instructions impermissibly demonstrated bias and hostility toward the defense case.

### A

The first part of this claim of error arises out of comments made by defense counsel about the testimony of Glenda Hightower. She had testified, as a state's witness concerning the Littman killing, that she had heard conversations between Littman, Robinson and the defendant about the fact that, during the bank robbery in which all three had played a role, Littman's face had

been uncovered so that he might have been photographed by the bank's cameras. According to Hightower, the defendant said to Robinson, "Rico got to go." During the defendant's summation, defense counsel denigrated Hightower's credibility, stating that she had testified against both Robinson and the defendant in another case[21] and the jury had not believed her then, and that she still owed the police cooperation in return for leniency in cases pending against her. Finally, he stressed the close relationship between Hightower and certain Hartford detectives, who had traveled to Kentucky and back to obtain her testimony against the defendant.[22] The trial court, sua sponte, instructed the jury to disregard these remarks as "improper," that the detectives' actions were "normal procedure," and that Hightower had not been accorded special treatment.[23] Defense counsel took proper exception to these remarks.

---

[21] Hightower had testified against the defendant at a bank robbery trial in 1982. The defendant was acquitted of those charges.

[22] Defense counsel argued to the jury: "You heard the testimony of Detective Bolden, and don't forget Defendant's Exhibit Number 19—the letter from . . . [Hightower's] lawyer, talking about how much those police officers did for her. Do you really believe that she didn't know that? They even went down to pick her up in Kentucky at the Federal Prison and brought her back up to testify, and then brought her back down again. Personal service by those officers."

[23] The trial court, during its instructions, stated: "In reference to Glenda Hightower's testimony in another case, the one in 1982, which you heard Mr. Smyth said returned a Not Guilty verdict for the Defendant as to a bank robbery, Mr. Smyth indicated that in that case, the jury didn't believe Glenda Hightower. First of all, you're not to be influenced by another tribunal, or another factfinder in determining the credit of a witness who had appeared before you. Nor do you know what the evidence was in that other case. In effect, what I'm saying is that remark was improper and you are not to be influenced by it.

"The second remark was that officers of this State gave her service from Lexington, Kentucky, to be a witness in that case. This is a normal procedure, where somebody is confined in another state, and is necessary to be a witness in a case in this state . . . . So there wasn't any special service given to such a witness to come to this state to testify in that other case. And you're not to be influenced by that remark."

A trial court has wide discretion to determine the propriety of counsel's argument and may caution the jury to disregard improper remarks in order to contain prejudice. A reviewing court may only disturb the trial court's actions in instances of abuse of this wide discretion. *State* v. *Kemp,* 126 Conn. 60, 83, 9 A.2d 63 (1939); *State* v. *Murphy,* 124 Conn. 554, 568, 1 A.2d 274 (1938). In this case, the trial court's cautionary remarks were justified because the argument of counsel was, indeed, unjustified.

In argument before the jury, "trial counsel should not state or suggest an inference from facts that are not in evidence." *State* v. *Manley,* 195 Conn. 567, 580, 489 A.2d 1024 (1985); see also *State* v. *Ubaldi,* 190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); *State* v. *Haskins,* 188 Conn. 432, 457, 450 A.2d 828 (1982). The defendant had introduced no evidence from which this jury could infer that the earlier jury had disbelieved Hightower's testimony. *State* v. *Kelly,* 208 Conn. 365, 376, 545 A.2d 1048 (1988) ("The fact that Bolivar was acquitted is of no probative value in this case. . . . It is impossible to determine why he was acquitted by the jury."); see also *United States* v. *Wiley,* 534 F.2d 659, 664–65 (6th Cir.), cert. denied sub nom. *O'Donnell* v. *United States,* 425 U.S. 995, 96 S. Ct. 2209, 48 L. Ed. 2d 819 (1976). Neither had he introduced any evidence that the conduct of the detectives in accompanying Hightower from the Kentucky prison was anything other than "usual procedure." This evidence thus lent no support to the defendant's effort to impeach Hightower's credibility on the basis of bias or prejudice. On this record, we conclude that the trial court did not abuse its discretion in instructing the jury that it should disregard those portions of the defendant's closing argument.[24]

---

[24] The defendant places great emphasis on the trial court's use of the term "improper" in characterizing parts of the defendant's closing argument.

## B

.The second part of this claim of error also concerns a comment by the trial court about closing argument by defense counsel. Defense counsel suggested to the jury that Edward Condon, who had testified to having observed a lone white person with stringy hair hanging on to the outside of Gore's van and then running from the scene of the crime, might have seen not the defendant but Loretta Swain. Such a suggestion was consistent with the defendant's theory that Swain alone committed the crime. Regarding this theory, the trial court instructed the jury: "[Y]ou should ask yourselves two questions, and this would be drawn from inferences from the facts that you have before you, and the evidence that has been presented in this case.

"The first question is: Would Loretta Swain, who knew Donald Gore from previous tricks that she admitted having with him, rob him when he would have known her? The second question you should ask yourself, would Mr. Gore attempt to turn the ignition on, and drive the van out of the parking lot to avoid being shot by a passenger who had a gun, and was seated next to him?" The defendant excepted to this portion of the trial court's instructions, noting that the state had never raised such an argument. He now argues that the court's questions impugned his defense theory, thus depriving him of a fair trial. We are not persuaded that the court's questions went so far beyond the boundaries of permissible commentary on the evidence as to prejudice the defendant's case. *State* v. *Pollitt,* 205 Conn. 132, 155, 531 A.2d 125 (1987); *State* v. *Taylor,* 196 Conn. 225, 232, 492 A.2d 155 (1985).

---

He claims that this usage unnecessarily and erroneously cast defense counsel, and therefore the defendant, in a bad light. Reading the court's charge as a whole; *State* v. *Quintana,* 209 Conn. 34, 43, 547 A.2d 534 (1988); we conclude that the word "improper" did not prejudice the defendant.

There was nothing inherently inconsistent between the court's questions and the defendant's theory that Swain had killed Gore out of fear. Whether Swain would have attempted to rob Gore, who knew her, was not relevant to whether she might have killed him for another reason. Similarly, whether Gore would have attempted to start his van while his assailant was seated next to him was irrelevant to the identity of the person whom Condon had seen. We conclude, therefore, that the questions asked by the court were not such an abuse of its discretion as to deprive the defendant of a fair trial.

V

The defendant's penultimate claim is that the trial court erred in failing to instruct the jury on the lesser included offenses within the crime of murder. With respect to the Littman killing, the defendant requested an instruction on the lesser included charges of manslaughter in the first and second degrees because of what he called the "tenuous nature of the evidence" of the defendant's actual conduct. The trial court refused this request as lacking in evidentiary support. The defendant took exception to the trial court's ruling.

" 'A defendant is entitled to an instruction on a lesser offense if, and only if, the following conditions are met: (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of

the greater offense but guilty of the lesser.' " *State* v. *Green,* 207 Conn. 1, 11, 540 A.2d 659 (1988), quoting *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980). Although the first two requirements have been fulfilled,[25] we must determine whether the defendant's request complied with the third and fourth requirements of *Whistnant.*

This issue must be addressed in the terms in which it was presented to the trial court. *State* v. *Carter,* 198 Conn. 386, 390 n.3, 503 A.2d 576 (1986); *State* v. *Rothenberg,* 195 Conn. 253, 262-63, 487 A.2d 545 (1985). Because "[a] lesser included offense instruction is 'purely a matter of our common law'; *State* v. *McIntosh,* 199 Conn. 155, 158, 506 A.2d 104 (1986); rather than a constitutional right"; *State* v. *Thomas,* 205 Conn. 279, 282, 533 A.2d 553 (1987); see also *State* v. *Whistnant,* supra, 581; we decline to review justifications for the lesser charge that the defendant did not raise at trial. See *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

To the trial court, the defendant argued that the following evidence supported his theory that he might have participated in the killing of Littman without having had the specific intent to commit murder. The defendant referred to Hightower's testimony that he

---

[25] The state claims that, although the defendant made his request in timely fashion, prior to the jury instructions, it was deficient in form because it failed to set out "a complete statement of the essential facts and law justifying the charge in the form requested." *State* v. *Green,* 207 Conn. 1, 12, 540 A.2d 659 (1988). In this case, however, defense counsel, upon inquiry to the trial court, had been reassured that he need not file a formal, written request to charge and that his oral request sufficed. In these circumstances, we cannot find the proposed instruction "inappropriate." See also Practice Book § 852.

Both parties agree that the second requirement has been met. We have interpreted General Statutes § 53a-45 (c) as a legislative determination that a defendant cannot commit murder without first having committed manslaughter. *State* v. *Rodriguez,* 180 Conn. 382, 407, 429 A.2d 919 (1980).

had said that Littman "got to go" as possibly a misunderstanding of the defendant's actual statement that Littman "got to leave."[26] He also cited the testimony of Shannon that the defendant had told him that he had not killed Littman but had only helped to dispose of his body.

Considering this evidence in a light most favorable to the defendant's request, as we are obliged to do; *State* v. *Smith,* 185 Conn. 63, 77–78, 441 A.2d 84 (1981); *State* v. *Morin,* 180 Conn. 599, 609, 430 A.2d 1297 (1980); we conclude that the trial court did not err in refusing to give the manslaughter charges. The trial court need only charge the jury on a lesser included offense charge if the defendant or the state has introduced " 'some evidence . . . justif[ying] conviction of the lesser offense . . . and . . . the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser.' " *State* v. *Green,* supra, 11; *State* v. *Whistnant,* supra, 588. In this case, the reasons proffered by the defendant at trial did not support a finding that the element of intent, which differentiates manslaughter in the first and second degrees from murder; General Statutes §§ 53a-54a, 53a-55, 53a-56; was sufficiently in dispute to warrant a manslaughter instruction. The alleged ambiguity in the Hightower testimony and the allegedly exculpatory implication of the Shannon testimony might tend to show that the defendant did not commit the murder at all, but they do not address the defendant's specific intent with regard to the Littman killing. Accordingly, we find no error in the trial court's refusal to instruct the jury on lesser included charges.

---

[26] On cross-examination, Hightower acknowledged that she sometimes used the words "go" and "leave" interchangably.

## VI

The defendant's final claim of error is that by denying his several motions to obtain Swain's psychiatric records, the trial court violated his rights to confrontation and cross-examination under both the federal and state constitutions. Although the court itself examined the records, in camera, they were never made available to the defendant.

At the probable cause hearing, while cross-examining Swain, the defendant requested certain of her psychiatric records. When Swain invoked her privilege not to disclose the records, the trial court conducted an in camera inspection and found that the records contained "no exculpatory material" relevant to this case. The defendant then moved that Swain's testimony be stricken. The court, while denying this motion, agreed to alert the defendant if, during the remainder of the defendant's cross-examination, any portion of the records[27] became relevant. The defendant acquiesced in this procedure without waiving his exception to the trial court's refusal to allow him to look at the records. The defendant did not again seek disclosure of the psychiatric records during the probable cause hearing,[28] nor did the trial court indicate that the records had become relevant.

At trial the defendant asked Swain on cross-examination if she had been hospitalized for psychiatric reasons during 1985 and 1986. After the state objected

---

[27] At the probable cause hearing the trial court marked for identification records pertaining to Swain's hospitalization at the Connecticut Mental Health Center and at St. Francis Hospital.

[28] The defendant did not renew his request to examine Swain's records even though, during this cross-examination, Swain testified that she had lied to doctors at the Connecticut Mental Health Center about "hearing things" to gain admittance to the hospital because she was paranoid and scared.

and the court excused the jury, the defendant offered to prove that Swain had had psychiatric problems at about the same time that she had given statements to police concerning the Gore and Littman slayings and that these problems might affect her credibility. The trial court denied the offer, explaining that Swain's statement had not been offered as evidence and finding that she was testifying from her present memory "[a]nd there's no showing to the Court that her present memory is affected by any psychiatric treatment . . . . " The court noted, however, that "at a later time that may be permitted."

The defendant then sought the disclosure of the psychiatric records to make a further showing. The trial court stated that it had previously reviewed the records and found nothing that would impugn Swain's credibility. It put off a ruling on disclosure to a later time, in order to "give [the defendant] another opportunity of inquiring concerning that." Finally, upon reviewing its notes of its in camera inspection of the medical reports, the trial court repeated its conclusion that nothing therein related to Swain's present competency to testify nor to her credibility at the time of the incidents about which she had testified.

This court has previously undertaken the task of balancing a witness' psychiatric privilege against a defendant's right of confrontation. See *State* v. *Hufford,* 205 Conn. 386, 400–405, 533 A.2d 866 (1987); *State* v. *Pierson,* 201 Conn. 211, 225–28, 514 A.2d 724 (1986); *State* v. *Bruno,* 197 Conn. 326, 329–32, 497 A.2d 758 (1985), cert. denied, 475 U.S. 1119, 106 S. Ct. 1635, 90 L. Ed. 2d 181 (1986); *State* v. *Esposito,* 192 Conn. 166, 177–80, 471 A.2d 949 (1984); *State* v. *Storlazzi,* 191 Conn. 453, 455–63, 464 A.2d 829 (1983). As recently restated, " '[t]he linchpin of the determination of the defendant's access to the records is whether they sufficiently disclose material "especially probative of

the ability to 'comprehend, know and correctly relate the truth' " . . . so as to justify breach of their confidentiality and disclosing them to the defendant in order to protect his right of confrontation. . . .' " (Citation omitted.) *State* v. *Kelly,* supra, 379–80, quoting *State* v. *Storlazzi,* supra, 459. The defendant has a legitimate interest in " 'access to records bearing on the "mental unsoundness of a witness . . . at or around the time of trial or of the occurrence about which he is to testify" . . . .' " *State* v. *Kelly,* supra, quoting *State* v. *Piskorski,* 177 Conn. 677, 736, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). Nonetheless, access to " ' "such [records] must be left to the discretion of the trial court which is better able to assess the probative value of such evidence . . ." and to weigh that value against the interest in confidentiality of the records. Whether and to what extent access to the records should be granted to protect the defendant's right of confrontation must be determined on a case by case basis.' " *State* v. *Kelly,* supra, quoting *State* v. *Storlazzi,* supra.

Thus, under our case law, there are two points at which a witness' possible mental unsoundness is relevant: "at or around the time of trial or of the incident about which he is to testify." *State* v. *Kelly,* supra, 380. The defendant seeks to have us adopt a third point of relevance: at the time the "evidence" was first given to police. He argues that around the time that Swain first gave a statement to police, August 22, 1985, she had visited two psychiatric hospitals claiming that she had been hearing voices and that he had a right to reveal this to the jury to undermine her credibility.

We need not decide in this case, however, whether a defendant may have access to psychiatric reports from around the time that the witness first gave statements to police. The trial court found that Swain had testified from her memory of the incident and not from

her police statement. That finding was not clearly erroneous. Thus, even if we were to adopt the defendant's suggested third point of relevance, in this case, because Swain's police statement never came into evidence,[29] her mental state at the time of that statement would not have been at issue. In these circumstances, the trial court did not abuse its discretion in denying the defendant's motion to disclose the psychiatric records.

There is no error.

In this opinion the other justices concurred.

[29] The state did read into evidence portions of a second statement Swain gave to police on September 9, 1985. The defendant did not, however, seek the disclosure of the psychiatric records at this point.