STATE OF CONNECTICUT *v.* WILLIE J. BRASWELL
(10182)

SPEZIALE, C. J., PETERS, HEALEY, GRILLO and COVELLO, Js.

Argued May 2—decision released August 28, 1984

*Jean E. Blue,* special assistant public defender, for the appellant (defendant).

*Susann E. Gill,* special assistant state's attorney, with whom were *John M. Massameno,* assistant state's attorney, and, on the brief, *John M. Bailey,* state's attorney, and *Warren Maxwell, Jr.,* assistant state's attorney, for the appellee (state).

SPEZIALE, C. J. The defendant was convicted by a jury of the crimes of unlawful restraint in the first degree; General Statutes § 53a-95; sexual assault in the first degree; General Statutes § 53a-70; and robbery in the second degree; General Statutes § 53a-135 (a) (2). On appeal from the judgment rendered, the defendant raises three claims of error. We find no error.

The jury could reasonably have found the following facts: On the night of June 30, 1977, the defendant was a patron of a restaurant in Windsor. Also in the restaurant that night was a woman who sat at the bar drinking beer. The woman left the bar about midnight and began to walk toward her home. As she walked

along Windsor Avenue the defendant approached her from behind, placed a knife at her back, and ordered her to continue walking.

When they reached the Dickers Brook overpass of Windsor Avenue, the defendant dragged the woman into a culvert, placed the knife at her neck, and forced her to engage in sexual intercourse. The defendant then took the victim's wallet, containing fifty-five dollars, and fled.

After discussing the attack with relatives and an off-duty police officer, the victim filed a complaint with the Windsor police department on July 5, 1977. On July 7, 1977, Detective Overstrom of the Windsor police department showed a photographic array of nine suspects to the victim. From that array she selected a photograph of the defendant and identified him as the person who she claimed had raped and robbed her on the night in question.

A warrant was subsequently issued for the defendant's arrest based on the victim's complaint. The defendant was located while serving a prison sentence in Maryland for an offense that he had committed in that state in April, 1978. Connecticut authorities then filed a detainer against him with Maryland prison officials pursuant to General Statutes § 54-186, the Interstate Agreement on Detainers (hereinafter the IAD), and returned the defendant to Connecticut for trial.

After the jury returned its verdict of guilty the trial court sentenced the defendant to a total effective term of not less than thirteen years nor more than twenty-eight years. The defendant appealed from that judgment, claiming that the trial court erred: (1) in denying his motion to dismiss the charges based on the state's failure to comply with the IAD; (2) in denying his motion in limine which sought to prohibit the state from mentioning three prior felony convictions

as impeachment evidence; and (3) by failing explicitly to instruct the jury during supplemental instructions on the sexual assault charge that it might find the defendant not guilty.

I

Before trial the defendant moved for dismissal of all charges claiming that the state had failed to abide by the time standards set forth in the IAD for prompt disposition of the underlying charges. The trial court, *A. Armentano, J.,* denied that motion. At the commencement of trial the defendant again moved for dismissal on the same ground. The trial court, *Bieluch, J.,* held an evidentiary hearing, at which the following evidence was adduced: The defendant was arrested by Maryland authorities on April 21, 1978, and charged in connection with a robbery that he had allegedly committed in that state. He remained incarcerated in Maryland pending trial. On August 31, 1978, the defendant was convicted of robbery by a Maryland court and was sentenced to a term of three years imprisonment in the Maryland state penitentiary.

On September 8, 1978, Maryland prison officials notified the defendant that Connecticut authorities had filed a detainer[1] against him based on untried charges in Connecticut.[2] Pursuant to IAD provisions, which are triggered by the filing of the detainer, the defendant

[1] The United States Supreme Court has defined a "detainer" as " 'a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction.' " *United States* v. *Mauro,* 436 U.S. 340, 359, 98 S. Ct. 1834, 56 L. Ed. 2d 329 (1978), quoting H. R. Rep. No. 91-1018, 91st Cong., 2d Sess. 2 (1970); S. Rep. No. 91-1356, 91st Cong., 2d Sess. 2 (1970); quoted in *Cuyler* v. *Adams,* 449 U.S. 433, 436, n.3, 101 S. Ct. 703, 66 L. Ed. 2d 641 (1981).

[2] Both Connecticut and Maryland are signatories of the Interstate Agreement on Detainers. See Connecticut General Statutes § 54-186; Maryland Ann. Code art. 27, §§ 616A through 616R.

then signed what is known as a form 2,[3] notifying Connecticut authorities of his place of incarceration and requesting disposition of all untried charges. He also acknowledged a form 4, wherein Maryland authorities agreed to surrender temporary custody of the defendant to Connecticut. On the same day, September 8, 1978, the defendant delivered these documents to his prison social worker for delivery to Connecticut authorities.

Maryland officials sent both documents, along with a certificate of inmate status, to the Superior Court clerk in Windsor by certified mail. The postmark on the envelope in which the documents were sent was illegible. The Superior Court clerk did not receive the documents until October 3, 1978, twenty-five days after the defendant had turned his request over to Maryland officials for delivery to Connecticut.

William J. Strong, Jr., the superintendent of postal operations for the United States Post Office in Windsor, testified that the documents had probably reached the Windsor Post Office on October 2, 1978. He stated that the normal delivery time from Maryland to Connecticut for certified mail is two days. Strong further testified that the envelope containing the documents bore evidence of having been missent. On the back of the envelope was an illegible post office stamp made by a cancelling machine. This indicated to Strong that the envelope had originally been sent to the wrong post office and had been rerouted.

After receiving the defendant's request for final disposition of the charges, Connecticut authorities took temporary custody of the defendant and brought him to Connecticut for trial. The trial commenced on March 15, 1979, which was 164 days after Connecticut authori-

[3] "A form 2, when completed by a prisoner, gives notice of his place of imprisonment and his request for disposition of foreign indictments, informations, or complaints." *Giardino* v. *Bourbeau,* 193 Conn. 116, 118 n.3, 475 A.2d 298 (1984).

ties received the defendant's request, but 189 days after the defendant had executed the forms and had given them to Maryland prison officials for delivery.

The IAD specifically provides that whenever the state lodges a detainer against one who is imprisoned in another state, that prisoner "shall be brought to trial within one hundred eighty days after he *shall have caused to be delivered* to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint." (Emphasis added.) General Statutes § 54-186 Art. III (a).

The defendant's claim of error centers on the proper interpretation of the phrase "shall have caused to be delivered" as used in the IAD. The defendant argues that that phrase is intended to denote the date that a prisoner requests officials of the custodial state (Maryland) to forward his request for final disposition to the demanding state (Connecticut). He therefore contends that the IAD required Connecticut to bring him to trial within 180 days of the date on which he turned his request for final disposition over to Maryland officials for delivery to Connecticut. He concludes that, because he was not brought to trial by the state of Connecticut until 189 days after the date that he gave his request to Maryland prison officials, the prosecution should have been dismissed for failure to comply with the IAD. We disagree.

We previously have had occasion to interpret the phrase "has caused to be delivered" in a related statutory context. In *State* v. *Springer,* 149 Conn. 244, 178 A.2d 525 (1962), the question before the court concerned the requirement in the *intra*state detainer statute that one imprisoned in Connecticut against whom there exists an untried indictment or information must

be brought to trial "within one hundred twenty days after he *has caused to be delivered,* to the prosecuting official . . . written notice of the place of his imprisonment and his request for final disposition to be made of the indictment or information." (Emphasis added.) General Statutes (Rev. to 1961) § 54-139.[4] There, the defendants argued that the 120 day period started with the date that the prisoner submitted his or her request for disposition to the warden of the prison. *State* v. *Springer,* supra, 248. We rejected the defendants' argument. "It is the completed delivery of both the request and the supplemental information which starts the running of the period of 120 days within which the prisoner must be brought to trial. . . . The phrase 'has caused to be delivered' is the equivalent of 'has delivered.' " Id., 250; see *State* v. *Antrum,* 185 Conn. 118, 120 n.3, 440 A.2d 839 (1981).

Although the statute at issue in *State* v. *Springer* related to *intra*state rather than *inter*state detainers, we find the interpretation of the phrase in question to be entirely consistent with both the terms and the spirit of the IAD. Subsection (b) of Article III sets out the procedure by which a prisoner may request final disposition of the foreign charges. "The written notice and request for final disposition referred to in paragraph (a) hereof *shall be given or sent by the prisoner* to the warden, commissioner of correction or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested." (Emphasis added.) Id. Given the IAD's use of the word "sent" in subsection (b), we must presume that its use of the word "delivered" in subsection (a) signifies its recognition of the different meanings commonly attributed to each word. Cf. *Doe*

---

[4] The intrastate agreement on detainers now appears in General Statutes §§ 54-82c through 54-82e.

v. *Manson,* 183 Conn. 183, 187, 438 A.2d 859 (1981); *Jones* v. *Civil Service Commission,* 175 Conn. 504, 509, 400 A.2d 721 (1978). It follows that had the IAD intended the 180 day disposition period to commence when the prisoner places his or her request with the custodial officials, subsection (a), like subsection (b), would refer to the date on which the prisoner causes the request to be sent, rather than the date on which it was caused to be delivered.

The IAD "is a congressionally sanctioned interstate compact the interpretation of which presents a question of federal law." *Cuyler* v. *Adams,* 449 U.S. 433, 442, 101 S. Ct. 703, 66 L. Ed. 2d 641 (1981). The decisions of both federal and other state courts therefore may guide our interpretation of its provisions. Although some courts have at least implied a different interpretation, the majority have interpreted the IAD's 180 day provision to commence on the date that the demanding state receives the prisoner's request for final disposition. See generally 98 A.L.R.3d 160 § 15 (a) (1980 and 1981 Sup.) and cases cited therein. "[T]he plain language of Article III, as well as the fair and reasonable construction thereof . . . leads to the conclusion that the date of *receipt* of notice by the prosecuting authorities triggers the statutory period." (Emphasis in original.) *Beebe* v. *Vaughn,* 430 F. Sup. 1220, 1223 (D. Del. 1977); see *Young* v. *Mabry,* 471 F. Sup. 553, 561 (E.D. Ark. 1978); *Scrivener* v. *State,* 441 N.E.2d 954, 956 (Ind. 1982); *State* v. *White,* 234 Kan. 340, 673 P.2d 1106, 1109–10 (1983); *Commonwealth* v. *Fisher,* 451 Pa. 102, 104–105, 301 A.2d 605 (1973).

The defendant argues that to interpret the IAD as requiring disposition of charges within 180 days of the state's receipt of the prisoner's request violates the spirit of the IAD. He contends that under our interpretation of Article III (a) the defendant's right to a speedy disposition of the foreign charges could be abrogated

if the custodial officials fail to transmit his request to the demanding state so long as trial is held within 180 days of the demanding state's receipt. This, he argues, would defeat the IAD's purpose to promote "speedy trial of persons already incarcerated in other jurisdictions" and "to encourage the expeditious and orderly disposition . . . [of] untried indictments, informations or complaints." General Statutes § 54-186 Art. I. This argument overlooks an important provision of the IAD. Under Article III (b) custodial officials "shall promptly forward" the prisoner's request for final disposition to the demanding state. This section places an independent requirement on custodial officials. Because officials of the custodial state act as agents of the demanding state for purposes of the IAD; *Giardino* v. *Bourbeau,* 193 Conn. 116, 126, 475 A.2d 298 (1984); *Narel* v. *Liburdi,* 185 Conn. 562, 572, 441 A.2d 177 (1981), cert. denied, 456 U.S. 928, 102 S. Ct. 1974, 72 L. Ed. 2d 443 (1982); if custodial officials fail to act promptly in transmitting the prisoner's request the charges in the demanding state must be dismissed. Under the circumstances of this case, however, we cannot say that a delay of 25 days in forwarding the request, particularly when there is evidence that the request was mishandled by the postal service, constitutes a failure to act "promptly" that would warrant dismissal of the charges.

We conclude that under Article III (a) of the IAD the demanding state must bring the prisoner to trial within 180 days of the date on which the demanding state receives the prisoner's request for final disposition and notice of place of imprisonment. Because, in this case, Connecticut brought the defendant to trial 164 days after receiving those documents, the trial court did not err in denying the defendant's motion to dismiss for violation of Article III (a) of the IAD.

## II

The defendant's second claim of error concerns the trial court's denial of his motion in limine, by which he sought to prevent the state from mentioning certain prior convictions to impeach his testimony if he were to decide to take the stand.

The defendant previously had been convicted of three crimes similar to those charged by this information. In December, 1964, the defendant pleaded guilty to rape; in January, 1972, he pleaded guilty to robbery with violence; and in August, 1972, he pleaded guilty to sexual contact in the first degree. After the state presented its case-in-chief, the defendant called two witnesses in his behalf. Defense counsel then informed the trial court that the defendant elected not to testify in his own defense.[5] Nevertheless, defense counsel went on to make an oral motion in limine asking the trial court to bar the admission into evidence of the defendant's prior convictions as impeachment evidence if the defendant chose to testify. He argued that the 1964 conviction should be excluded because the conviction was too remote to bear on the defendant's present credibility and because its prejudicial effect would far outweigh its probative value. As to the two 1972 convictions, defense counsel argued that because those crimes were similar to the charges being tried, their prejudicial effect would far outweigh their probative value. The trial court denied the defendant's motion in limine, thereby permitting the state to introduce the three previous convictions to impeach the defendant's testimony if he were to testify. On appeal the defendant claims that the trial court erred in denying the motion in limine. We disagree.

---

[5] Defense counsel informed the court: "I do wish to state that Mr. Braswell and I have talked it over. He elects not to take the stand and I didn't think it would be appropriate to—naturally to state that in front of the jury."

General Statutes § 52-145 (b) provides that "conviction of [a] crime may be shown for the purpose of affecting [a witness's] credibility." Under our interpretation of that statute, "a conviction of a crime, whether or not the crime is denominated a felony, is admissible under § 52-145, only if the maximum permissible penalty for the crime may be imprisonment for more than one year." *Heating Acceptance Corporation* v. *Patterson,* 152 Conn. 467, 472, 208 A.2d 341 (1965); see *State* v. *Geyer,* 194 Conn. 1, 10–11, 480 A.2d 489 (1984); *State* v. *Carter,* 189 Conn. 631, 642, 458 A.2d 379 (1983); *State* v. *Nardini,* 187 Conn. 513, 521, 447 A.2d 396 (1982); *State* v. *Shaw,* 185 Conn. 372, 383, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982); *State* v. *Townsend,* 167 Conn. 539, 563, 356 A.2d 125, cert. denied, 423 U.S. 846, 96 S. Ct. 84, 46 L. Ed. 2d 67 (1975); *State* v. *Bitting,* 162 Conn. 1, 8–9, 291 A.2d 240 (1971); *State* v. *Marquez,* 160 Conn. 47, 52, 273 A.2d 689 (1970). If a defendant in a criminal case has previously been convicted of crimes punishable by imprisonment for more than one year, a trial court may allow the state to introduce those convictions at a trial on subsequent charges as evidence related to the defendant's credibility, where credibility is in issue. The trial court may properly admit evidence of prior convictions provided that the prejudicial effect of such evidence does not "far outweigh" its probative value. *State* v. *Geyer,* supra, 6–7; *State* v. *Nardini,* supra; *State* v. *Marquez,* supra. Because this determination is within the trial court's discretion, it may be overturned on appeal only if the trial court abused that discretion by allowing prior convictions to be introduced. *State* v. *Geyer,* supra, 13; *State* v. *Binet,* 192 Conn. 618, 623, 473 A.2d 1200 (1984); *State* v. *Carter,* supra; *State* v. *Iasevoli,* 188 Conn. 325, 329, 449 A.2d 996 (1982). We find no abuse of discretion here.

In moving to bar introduction of prior convictions a defendant in a criminal case bears the burden of demonstrating the specific harm that will occur if the convictions are introduced. *State* v. *Binet,* supra, 624. Here, the record indicates that the defendant's argument in support of his motion amounted to little more than a perfunctory recitation of the prior conviction, a conclusory statement as to its prejudicial effect, and a request for a ruling.[6] Furthermore, defense counsel told the trial court *before* argument on the motion in limine that the defendant had chosen not to testify. At no time thereafter did he indicate under what circumstances, if any, the defendant would choose to testify.

---

[6] In arguing in support of the motion in limine defense counsel Eisenman stated:

"Mr. Eisenman: Your Honor, my objection to the 1964 case is twofold. It's too remote and secondly—

"The Court: It's too old?

"Mr. Eisenman: Too remote or too old. Too remote I think is the correct terminology. But secondly, being a rape charge, its prejudicial effect would far outweigh its probative value to the State, the probative value being, of course, that someone convicted of a felony is less believable than one who has no record. That, of course obviously is the purpose of introducing a record of prior convictions. But our courts have held that where the prejudicial effect would far outweigh that particular purpose, then the Court, in its discretion, would deny the State permission to introduce that particular conviction for that purpose."

\* \* \*

"The Court: The motion to suppress the evidence of the 1964 conviction, December 11, 1964 conviction is denied."

\* \* \*

"[Mr. Eisenman:] Well, for the record, I certainly don't want to be presumptuous so I am going to ask for a ruling on the other two for the record, the '72 robbery conviction. I am not alleging remoteness on that. I am claiming remoteness, but I am claiming, since one of the charges is of robbery, the prejudicial effect far outweighs the probative value. May I have a ruling?

"The Court: Denied.

"Mr. Eisenman: And sexual contact, a lesser—at that time a lesser included offense of one of the charges now, of course that would now be called, I believe, sexual assault in the third degree, too similar to the act now charged, prejudicial effect far outweighing probative value for impeach-

In reviewing a discretionary ruling we examine the evidence that was before the trial court at the time of its decision in order to determine if, based on that evidence, the trial court could reasonably conclude as it did. *State* v. *Binet,* supra; *Ivey* v. *Ivey,* 183 Conn. 490, 494–95, 439 A.2d 425 (1981); *Fattibene* v. *Fattibene,* 183 Conn. 433, 442, 441 A.2d 3 (1981); *Hardisty* v. *Hardisty,* 183 Conn. 253, 260, 439 A.2d 307 (1981). Given the meager showing of potential harm put forth by the defendant, the trial court's conclusion that the defendant had not satisfied his burden of showing overriding prejudice was not unreasonable.[7]

## III

The defendant's final claim of error concerns the trial court's instructions to the jury on the sexual assault charge.

On March 29, 1979, after both the state and the defendant had presented their evidence, the trial court instructed the jury as to all three crimes charged and all lesser included offenses. In summarizing its instructions on both the kidnapping and robbery charges the trial court instructed the jury that if a reasonable doubt existed as to any element of either charge the jury must return a verdict of not guilty on that charge. In sum-

ment purposes, request that that be suppressed.

"The Court: Anything, Mr. Maxwell?

"Mr. Eisenman: May I have a ruling? Oh, I'm sorry.

"[Assistant State's Attorney] Mr. Maxwell: No. I just repeat what I said before, sir.

"The Court: All right. Motion to suppress the other two convictions, that of January 28, 1972 and August 10, 1972 are denied."

[7] Nevertheless, we emphasize what we said recently in *State* v. *Geyer,* 194 Conn. 1, 16, 480 A.2d 489 (1984): "[T]he prudent course for a trial court faced with a decision whether to admit as evidence of credibility prior convictions for crimes that do not directly reflect on credibility is to allow the state to mention that the defendant was convicted of an unspecified crime or crimes carrying a penalty of more than one year, at a certain time and place."

marizing its instruction on the sexual assault charge the trial court instructed the jury that the defendant "cannot be found guilty . . . unless all elements of that offense have been proved beyond a reasonable doubt." Immediately before sending the jury out to deliberate, the trial court summarized its instructions as a whole and again stated: "[I]f, on the other hand, you find that the state has not proved [the defendant] guilty beyond a reasonable doubt of any or all of the counts as I have explained the terms to you, then it is your duty to find him not guilty of those counts." Neither the state nor the defendant excepted to the instructions.

On April 2, 1979, the jury asked to be instructed again about the degrees of the various charges and lesser included offenses. The trial court again gave detailed instructions on each charge, emphasizing the state's burden to prove each element of each charge. During the supplemental instructions on the kidnapping and robbery charges the trial court again informed the jury of its duty to return a verdict of not guilty if a reasonable doubt existed as to any element of the charge, but in reinstructing the jury about the sexual assault charge the trial court did not again specifically mention the duty to return a not guilty verdict if a reasonable doubt existed.

The defendant took exception to the trial court's failure to include the not guilty option in its reinstruction on the sexual assault charge. On appeal he claims that the trial court's reinstruction amounted to a directed verdict on the sexual assault charge, thereby constituting reversible error. Although it might have been preferable to amplify the charge after the defendant's exception we are unpersuaded that the trial court's failure to do so requires reversal of the defendant's conviction.

In reviewing the trial court's charge to the jury we must review the instructions as a whole, including any supplemental instructions. *State* v. *Reed,* 174 Conn. 287, 308, 386 A.2d 243 (1978); *Maciejewska* v. *Lombard Bros., Inc.,* 171 Conn. 35, 40, 368 A.2d 206 (1976); *State* v. *Edwards,* 163 Conn. 527, 537, 316 A.2d 387 (1972). "[I]ndividual instructions are not to be judged in artificial isolation from the overall charge. *State* v. *Holmquist,* 173 Conn. 140, 151, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977); *Mazzucco* v. *Krall Coal & Oil Co.,* 172 Conn. 355, 357, 374 A.2d 1047 (1977)." *Cohen* v. *Cohen,* 182 Conn. 193, 199, 438 A.2d 55 (1980).

Examining the charge in its entirety, we find that the jury was fully informed not only of the state's burden to prove each element of the charge beyond a reasonable doubt but also that the state's failure to do so must result in a verdict of not guilty as to that charge. During its original instruction on the sexual assault charge the trial court instructed the jury the defendant "cannot be found guilty . . . unless all elements of the [sexual assault] charge have been proved beyond a reasonable doubt." In its conclusion the trial court also gave an omnibus instruction, applicable to all charges, specifically instructing the jury of its duty to return a not guilty verdict if the state failed to satisfy its burden of proving each element of each crime charged beyond a reasonable doubt. When the jury requested to be instructed again on the *degrees* of each crime charged the trial court was not required to repeat the not guilty option, even though it did so on the two other charges.

The trial court's instructions as to the sexual assault charge placed the burden of proving the defendant guilty beyond a reasonable doubt squarely on the state. Contrary to the defendant's claim, the jury was then

properly left to decide whether the state had satisfied that burden. See *State* v. *LaFountain,* 140 Conn. 613, 621–22, 103 A.2d 138 (1954).

There is no error.

In this opinion the other judges concurred.