STATE of Wisconsin, Plaintiff-Respondent,

v.

Lawrence C. WHITTEMORE, Defendant-Appellant.†

Court of Appeals

*No. 91-0861-CR. Submitted on briefs October 22, 1991.—Decided December 11, 1991.*

(Also reported in 479 N.W.2d 566.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Mark J. Rogers* of *Angermeier & Rogers* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle,* attorney general, and *Michael R. Klos,* assistant attorney general.

Before Nettesheim, P.J., Anderson and Snyder, JJ.

SNYDER, J.   Lawrence Whittemore appeals from an order denying his motion for postconviction relief. He challenged his conviction on the grounds that his trial was untimely under sec. 976.05, Stats., the Interstate Agreement on Detainers Act (IAD), and that certain evidence was wrongly excluded. We disagree and affirm.

Jose Morales was robbed and shot by two men on May 14, 1976. He died seventeen days later. On January 24, 1977, Whittemore, then incarcerated in Ohio,

received from the Kenosha county district attorney's office notification of a detainer against him for those crimes. Whittemore completed the various forms, including the part requesting final disposition of the charges, and returned them that same day to a prison official for transmittal back to Kenosha county.

On February 10, 1977, the Kenosha county district attorney signed a document accepting temporary custody of Whittemore. Whittemore arrived in Kenosha on March 11 to stand trial. After a three-day trial, beginning on August 1, 1977, the jury found Whittemore guilty of first-degree murder and attempted armed robbery.

On August 31, 1977, Whittemore filed a motion seeking a new trial in the interest of justice or, in the alternative, that his conviction be set aside or "reduced to a conviction for third-degree murder."[1] His motion challenged certain evidentiary rulings, the jury instructions, the sufficiency of the evidence, and claimed that under the IAD, the trial was untimely begun. The motion was denied. Neither Attorney Merlin Cotton (Whittemore's trial and postconviction counsel) nor any of the series of successor attorneys appointed by the public defender appealed this denial or took a direct appeal. Attorney Cotton is now deceased.

On January 25, 1991, this action was instituted with the filing of a motion pursuant to sec. 974.06, Stats. The motion challenged Whittemore's judgment of conviction and sentence on grounds of an untimely trial under sec.

---

[1]The document, entitled "Petition For New Trial Etc.," did not invoke sec. 974.06, Stats., and included, among other things, challenges to the jury instructions and the sufficiency of the evidence—grounds not permissible in a sec. 974.06 motion for postconviction relief. We presume the motion was a postconviction motion brought pursuant to Rule 809.30, Stats.

976.05(3)(a) and (4)(c), Stats., and deprivation of his due process rights because of the trial court's exclusion of certain testimony possibly supportive of Whittemore's defense of mistaken identity. The motion also alleged that, should any of the other grounds be deemed waived by a failure to pursue a direct appeal, Attorney Cotton had deprived Whittemore of his right to effective counsel. The motion was denied.

Whittemore appeals, raising the same issues and seeking dismissal of the complaint with prejudice. *See* sec. 976.05(5)(c), Stats. We address the first two issues on their merits because they either implicate the court's jurisdiction or are of constitutional dimension. *See* sec. 974.06(1), Stats. Therefore, since Whittemore is getting the full appellate review he seeks, we need not consider whether his posttrial counsel was ineffective for failing to bring a direct appeal.

The first issue is whether Whittemore's 1977 trial was untimely held under the IAD, sec. 976.05, Stats.,[2] thus depriving the trial court of jurisdiction to try and to

---

[2]Section 976.05, Stats., provides in relevant part:

(3) ARTICLE III. (a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, *he shall be brought to trial within 180 days after he has caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice* of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint . . ..

(b) The written notice and request for final disposition referred to in par. (a) shall be given or sent by the prisoner to the department, or warden, or other official having custody of him, who shall promptly forward it together with the certificate to the appro-

sentence him.[3] Resolution of this issue requires that we engage in statutory construction. Statutory construction is a question of law reviewable without deference to the trial court's reasoning. *State v. Wittrock,* 119 Wis. 2d 664, 669, 350 N.W.2d 647, 650 (1984).

■

Article III(a) of the IAD requires that a prisoner be brought to trial within 180 days after he has "caused to be delivered" to the prosecuting officer and the appropriate court written notice of the place of his imprisonment and his request for a final disposition of the charges. Section 976.05(3)(a), Stats. The threshold question is whether the statutory term is ambiguous. *See Wittrock,* 119 Wis. 2d at 669, 350 N.W.2d at 650. We conclude it is because the parties reasonably disagree as to its meaning. *See id.*

Whittemore's argument rests on the assumption that the highlighted phrase means the 180 days begin running on the date a prisoner delivers to officials of the *custodial* state his request for final disposition to the demanding state. The state, by contrast, contends the period begins to run when officials in the *demanding* state receive the request by registered or certified mail. Whittemore gave the signed request to the Ohio custodian on January 24, 1977; the custodian signed the necessary documents the next day. The Kenosha county district attorney signed a document accepting temporary

priate prosecuting official and court by registered or certified mail, return receipt requested. [Emphasis added.]

[3]We do not address Whittemore's argument that the state violated the 120-day provision of sec. 976.05(4), Stats. That section governs the time limits for bringing a defendant to trial when he has been returned to a state based on that state's request for temporary custody. Here, the state did not proceed under that section, rendering its deadlines inapplicable.

custody on February 10. Trial commenced on August 1. If Whittemore is correct, trial commenced on either the 187th or 188th day. If the state is correct, trial commenced on the 172nd day.

Wisconsin has not before considered this aspect of sec. 976.05, Stats. We are not without guidance, however, because sec. 976.05 is substantially identical to the IAD, 18 U.S.C.A. app. 2, sec. 2 (West 1989). Consequently, federal cases construing the IAD must be accorded considerable weight. *See First Wis. Nat'l Bank v. Nicolaou,* 113 Wis. 2d 524, 532, 335 N.W.2d 390, 394 (1983). Similar deference is accorded to cases arising in other party states to the IAD. *See Layton Inv. Co. v. Harris,* 43 Wis. 2d 21, 26, 168 N.W.2d 70, 73 (1969).

Most jurisdictions interpret the IAD's 180-day provision as commencing on the date that the demanding state receives the prisoner's request for final disposition. *State v. Braswell,* 481 A.2d 413, 417 (Conn. 1984), *cert. denied,* 469 U.S. 1112 (1985); *see also* 98 A.L.R.3d 160 sec. 15(a) (1980 and 1981 Supp.). The Supreme Court of Connecticut, for example, has construed the phrase "caused to be delivered" to be the equivalent of "has delivered." *See Braswell,* 481 A.2d at 417. "The plain language of Article III, as well as the fair and reasonable construction thereof . . . leads to the conclusion that the date of *receipt* of notice by the prosecuting authorities triggers the statutory period." *Id.* (quoting *Beebe v. Vaughn,* 430 F. Supp. 1220, 1223 (D. Del. 1977) (emphasis in original)).

The *Braswell* court arrived at this conclusion by comparing the language of subsec. (a) and subsec. (b) of the IAD's Article III. Subsection (a) speaks in terms of the prisoner causing notice to be *delivered.* Subsection (b), on the other hand, provides that in requesting final

133

disposition, the written notice and request shall be *given or sent* by the prisoner to the prison official.

> Given the IAD's use of the word "sent" in subsection (b), we must presume that its use of the word "delivered" in subsection (a) signifies its recognition of the different meanings commonly attributed to each word. It follows that had the IAD intended the 180 day disposition period to commence when the prisoner places his or her request with the custodial officials, subsection (a), like subsection (b), would refer to the date on which the prisoner causes the request to be sent, rather than the date on which it was caused to be delivered.

*Braswell,* 481 A.2d at 417 (citations omitted). We find this reasoning persuasive.

Whittemore next asserts that he should prevail nonetheless because the state has the burden of proving compliance with the IAD, *citing People v. Lewis,* 680 P.2d 226, 230 (Colo. 1984), *overruled on other grounds, People v. Higinbotham,* 712 P.2d 993, 999 (Colo. 1986). He maintains that February 10 is untenable as the date the 180 days began running because, under *State v. Hamilton,* 268 N.W.2d 56, 60-61 (Minn. 1978), January 28 is the first day his request *could have been* received[4] and thus is the latest date upon which the state can rely. He contends that *Hamilton*—"authority . . . with considerably more relaxed language"—favors him because "[i]n Minnesota the statutory language expressly sets the 6 month time period for trial to run from the date of 'receipt of the request and certificate by the court and prosecuting attorney.' " Whittemore apparently is sug-

---

[4]Section 801.15(5), Stats., sets a statutory presumption of three days for delivery of pleadings by mail.

gesting that the Wisconsin legislature could have been as explicit had it meant to say the same thing.

We are not persuaded. First, the "relaxed language" at issue in *Hamilton* was not from the IAD but from a companion statute, the Uniform Mandatory Disposition of Detainers Act. Second, the statement in *Lewis* regarding the burden of proof is taken out of context.[5] Contrary to Whittemore's assertion, the general rule is that a prisoner who alleges a violation of the IAD bears the burden of establishing that the notice required under Article III(a) was given. *United States v. Espinoza,* 866 F.2d 1067, 1070 (9th Cir. 1988). Whittemore has not met that burden. For instance, the record contains no return receipt from the notice having been sent by certified or registered mail. *See* sec. 976.05(3)(b), Stats. The only evidence indicating the date the Wisconsin authorities might have received the request for final disposition is the document signed by the Kenosha county district attorney accepting temporary custody. That document was file-stamped February 10, 1977. Absent proof of an earlier date, we can only conclude that the clock began running on February 10 and that the trial—held 172 days later—was timely.

The second issue involves the exclusion of certain testimony regarding nonverbal conduct of the victim, Morales, shortly before his death. Whittemore asserts that excluding it violated his due process rights because

[5]The issue in *People v. Lewis,* 680 P.2d 226 (Colo. 1984), *overruled on other grounds, People v. Higinbotham,* 712 P.2d 993, 999 (Colo. 1986), was whether the state had expeditiously notified the defendant of the detainer against him in the first instance. That should be the state's burden because it is within the state's power to prove.

135

it would have shown that Morales was identifying a person other than Whittemore as one of Morales' assailants.

Mistaken identity was one of the issues at trial, the question being whether Whittemore or another man, Lee Ray Wallace, was the accomplice in the shooting which resulted in Morales' death. The defense sought to elicit from Detectives Lee Ormson and Robert Hubbard the circumstances of their hospital interview with Morales shortly before he died. At that interview, the officers had shown Morales a photograph of Wallace.

The trial court allowed the defense to make an offer of proof. Out of the jury's presence, Detective Hubbard testified that after being shown the photograph, Morales, whose speech was hampered by a tracheostomy tube, "pointed . . . and made some noises" and "appeared visibly shaken." In addition, Morales attempted to say something in Spanish. A Spanish-speaking priest was in attendance and Detective Hubbard inferred "from what the priest said that this [photograph] was the party that had shot him [Morales]." The trial court excluded the testimony because it interpreted Morales' conduct as equivocal and as inviting jury speculation about the matter.

■

Exclusion of evidence is within the trial court's discretion and evidentiary rulings will be upheld on appeal absent an abuse of discretion. *State v. Cummings,* 153 Wis. 2d 603, 609, 451 N.W.2d 463, 465 (Ct. App. 1989). Since Whittemore raises a due process claim, we also must examine whether excluding the evidence deprived him of his constitutional right to the fair opportunity to defend against the state's accusations. *See Chambers v. Mississippi,* 410 U.S. 284, 294 (1973); *see also State v. Boykins,* 119 Wis. 2d 272, 279, 350 N.W.2d 710, 714 (Ct. App. 1984).

The trial court explained its ruling as follows:

[Morales'] various gestures and expressions which were testified to by the officers could mean one of a multitude of things . . .. [I]t could have been that the person in the photo was the one who shot him, or was the one who knew who shot him, or looked like the one who shot him, or could have been many other things. And based upon that, the Court is of the view that it is not evidence of such a nature as is reliable enough to be put into the record for consideration by the jury. So the Court has denied that, and I wanted to make it clear on the record the Court's reasoning for denying that. If it had turned out the other way . . . and it was a picture of the defendant and it was that reaction, we would have made the same ruling for the same reasons, because we don't know what was meant, and [Morales] is not here to find out what was meant by those gestures and so on.

The trial court thus articulated the reasons for its decision and arrived at a conclusion a reasonable judge could reach. We see no abuse of discretion.

As to the constitutional claim, we see no violation there, either. Whittemore's mistaken identity defense did not rest solely with the incident in Morales' hospital room. At trial, three other eyewitnesses named Whittemore as an accomplice in Morales' shooting. One, John Robinson, admitted that although he first selected Wallace's picture from the photo array, upon seeing Whittemore's photograph he realized Whittemore was the accomplice.

Similarly, Karen Shane earlier had identified Wallace as one of the two assailants. Shane also consistently identified Whittemore as one of the two assailants, how-

137

ever, testifying that she thought Wallace was the accomplice to Whittemore—not that Wallace was the accomplice to a third party. Finally, Pamela Nerdrum—herself assaulted by the two men who shot Morales—consistently identified Whittemore as one of Morales' assailants. Given this testimony and the ambiguity of Morales' nonverbal response, we cannot say that Whittemore was deprived of a fair opportunity to present a defense.

*By the Court.*—Order affirmed.