[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM AND ORDER
The petitioner, Augustus J. Pinto, filed a petition for a writ of habeas corpus, seeking to quash a detainer presently lodged against him pursuant to General Statutes § 54-186 et seq., Connecticut's Interstate Agreement on Detainers (hereinafter, IAD) by the state of New Jersey. For all of the following reasons the petition is dismissed.
 I.
The petitioner, Augustus Pinto, is an inmate at Enfield Correctional Institute. He has been incarcerated there since 1963 when he was convicted and sentenced to life in prison for violating General Statutes § 53-9, murder in the second degree.[1] On December 26, 1988, Mr. Pinto was released on a furlough from which he did not return. He remained at large until January 10, 1989, when he was captured and returned to custody.[2] On August 14, 1990, New Jersey lodged a detainer against the petitioner based upon an indictment charging the petitioner with conspiracy to commit robbery and murder in the county of Atlantic, New Jersey on or about December 30, 1988 through January 3, 1989. On April 24, 1997, the Commissioner of Correction John Armstrong applied for a writ of habeas corpus for the petitioner Augustus Pinto, who was serving his life sentence CT Page 483 in Connecticut, in an effort to comply with New Jersey's request for temporary custody (IAD "Form 5"[3]) filed October 9, 1996. The petitioner was brought before the court, Bishop, J., on May 6, 1997, for a pre-transfer hearing at which time he was notified of his rights pursuant to the detainer. The petitioner chose not to waive his rights and objected to involuntary transfer to New Jersey for disposition of the conspiracy charges. The court stayed the transfer and granted the petitioner until August 8, 1997, to file a petition for a writ of habeas corpus.[4] Mr. Pinto filed his petition on August 4, 1997.
In his petition for a writ of habeas corpus, the petitioner claims: 1) that his rights pursuant to the IAD were violated by a "failure to bring [him] to trial within 180 days of his January 1993 request for speedy disposition"; 2) that his rights pursuant to the IAD were violated by a "failure to bring [him] to trial within 180 days of his April 1995 request for speedy disposition"; 3) that his rights pursuant to the IAD were violated by a "failure to bring [him] to trial within 180 days of receipt of his July 1996 request for speedy disposition; and 4) that his rights pursuant to the IAD were violated by a "failure to bring [him] to trial within 120 days of New Jersey's request for temporary custody received by Connecticut DOC no later than October 21, 1996." PETITION FOR WRIT OF HABEAS CORPUS, July 28, 1997, pp. 4-5 (hereinafter, WRIT); PETITIONER'S MEMORANDUM INSUPPORT OF WRIT OF HABEAS CORPUS, September 2, 1998, pp. 19 (hereinafter, PET'S MEM.).[5]
 II.
In connection with Mr. Pinto's petition for a writ of habeas corpus, a hearing was held before the court on January 30, 1998, and March 20, 1998. Throughout the course of the hearing two witnesses testified: Lynn Milling, Supervisor for the Interstate Compact Office and Central Records of the Connecticut Department of Correction; Transcript, pp. 1-57, Pinto (January 30, 1998) (hereinafter, Transcript I); Transcript, pp. 1-14, 82-100 Pinto
(March 20, 1998) (hereinafter, Transcript II); and Michelle Deveau (formerly Michelle Humphrey), technical advisor to the Central Records Unit; Transcript, pp. 14-81, Pinto (March 20, 1998) (hereinafter, Transcript II). At the time of the hearing Ms. Milling had been the supervisor for the Interstate Compact Office since 1990; Transcript I, p. 3; and Ms. Deveau had been with the records department at Enfield from approximately 1990 to CT Page 484 1995. Transcript II, p. 16. Their testimony mainly concerned IAD procedure; specifically the use of Forms 1 through 9,[6] filed by the petitioner, Connecticut department of correction (hereinafter, DOC) and State of New Jersey, Office of the Attorney General.
This Court finds the following facts established at the hearing and relevant to the disposition of this matter. The petitioner was first notified of the existence of the New Jersey detainer on or about August 29, 1990, when he accepted delivery of the warrant. Joint Exh. 3; Transcript II, pp. 26-7. Although he refused to sign the accompanying IAD Form 1[7] he did accept delivery of the warrant. Joint Exh. 3; Transcript II, pp. 27, 46-7. The petitioner also received a Form 2 with the warrant and Form 1.[8] Joint Exh. 3; Transcript II, p. 47. The petitioner did not sign Form 2. Joint Exh. 3.
Two years later, on August 17, 1992, the petitioner sent a written request to Records "concerning [his] case in New Jersey," asking for "the court papers for a speedy trial." Joint Exh. 5.
In response to the request Forms 1 and 2 were given to the petitioner by his counselor, however they were not filled out or returned to the records department. Joint Exh. 5; Transcript II, pp. 24-26. The petitioner again, sent a written request, dated December 28, 1992, asking for the "court papers for New Jersey" because he wanted to "have them for Jan. 2, 1993." Joint Exh. 7.
The papers were sent December 30, 1992. Joint Exh. 7. Again, the petitioner refused to sign Form 1 acknowledging that he had been notified as to the existence of the warrant. Joint Exh. 7.
Sometime before January 20, 1993, Michelle Humphrey spoke with Deputy Attorney General Grove of New Jersey regarding the petitioner's intent to request a speedy disposition of the New Jersey charges. In a letter dated January 20, 1993, Grove wrote in response to their conversation: "It is my understanding that you believe Augustus Pinto will soon request, pursuant to the Interstate Agreement on Detainers, to have the criminal charges in New Jersey heard within 180 days. I would ask that once defendant Pinto invokes this right, you notify me at once."Joint Exh. 8.[9] Humphrey spoke again with Grove on or around January 29, 1993 and informed him that the petitioner was having medical testing done and had indicated that when he was feeling better he would sign the speedy trial papers. Joint Exh. 9.
A. FIRST REQUEST[10]
CT Page 485
On or around February 1, 1993, Grove received directly from the petitioner an undated request for final disposition of his charges. Grove sent a letter to the petitioner, dated February 1, 1993, explaining that his "Request for Final Disposition [was] legally defective and the State of New Jersey [would] not act upon it." Joint Exh. 10. He directed the petitioner to discuss the matter further with his counselor if he planned to request a speedy disposition. Joint Exh. 10. In July of 1993, Grove spoke, again with Humphrey. He inquired whether the petitioner was intending to file speedy disposition papers. Humphrey told Grove that the petitioner was still not feeling well and he would sign the papers when he was feeling better. Joint Exh. 9.
One year later, in August of 1994, the petitioner filed a motion for appointment of co-counsel status and a request for discovery in Atlantic Superior Court. Joint Exh. 32. In response to those filings, Grove sent a letter to the petitioner explaining that he was still considered an "Inactive Fugitive" and until he filled out the appropriate IAD paperwork he would continue to be so recognized. Joint Exh. 32. Grove also sent a letter to Judge Guerrera of the New Jersey Superior Court explaining the petitioner's August filings. He told Judge Guerrera that the Attorney General's Office did not recognize the motions as a legitimate request for speedy disposition under the IAD and that he hoped the Judge concurred. Joint Exh. 32.
B. SECOND REQUEST
Two years later on April 22, 1995, the petitioner sent a written request to the records department of the DOC, asking "that you submit the papers that are needed for me to apply for a speedy trial, under the Interstate Compact on Detainers." JointExh. 12. In response to the petitioner's request he was presented for his signature, Form 1 dated April 24, 1995, and Form 2, dated April 24, 1995 and signed by Warden Tarascio. The petitioner refused to sign the forms. Joint Exh. 13. In connection with Forms 1 and 2, a Form 3 had been filled out and signed by Warden Tarascio and a Form 4 was filled out, but not signed. Joint Exh. 14.
None of the forms were forwarded to or received by the IAD office.Transcript I, p. 41. However, the Petitioner filled out and signed a Connecticut Speedy Trial Notification and Request for Disposition form, dated April 24, 1995. The form lists the New Jersey charges and is initialed by Warden Tarascio. Joint Exh.16. The form was not, however, processed by the records CT Page 486 department. Transcript I, p. 45. Transcript II, p. 31.
In May of 1995 the petitioner sent directly to Grove, a packet of information. The packet was received on May 8, 1995, but it was dated May 10, 1995. Pet's Exh. 18. The packet included a letter to Grove, a Form 1 dated May 10, 1995 with Warden Matos's name appearing typed on the form, a Form 2 signed by the petitioner and dated May 10, 1995, an unofficial Form 1 signed by the petitioner and dated 1994, an unofficial Form 3 signed by the petitioner and dated May 10, 1995, and an unofficial Form 4, signed by the petitioner and dated May 5, 1995. The "official" Forms 1 and 2 that were sent to Grove contained altered dates; they were forms originally given to the petitioner in 1992 when Peter Matos was still the warden.[11]
C. THIRD REQUEST
In early January 1996, two additional sets of Forms 1 and 2 were received in the records department. The forms were not received according to proper procedure for processing, but instead were received and placed into the miscellaneous section[12] of the petitioner's Department of Correction file.[13] Transcript II, pp. 28-31. The first Form 1 is dated February 2, 1996, and January 5, 1996. Warden Matos' name appears typed on the document, although he was not the warden in 1996, and it is signed by the petitioner. Pet's Exh. 19. Form 2 is dated January 5, 1996, and it is also signed by the petitioner.Pet's Exh. 20. Both forms, though signed and dated in January of 1996, were photocopies of the 1992 forms which were previously presented to the petitioner for his signature, but were never returned to the records department for processing. Transcript II, pp. 27-28.[14] The second Form 1 is dated January 7, 1996, contains the typed name of Warden Matos, who was not the warden in 1996, and is not signed by the petitioner. Pet's Exh 21. The second Form 2 is dated January 7, 1996 and is signed by the petitioner. Pet's Exh. 22. According to Ms. Deveau, because Peter Matos was no longer the warden in 1996, the documents were invalid.[15]
Also placed in the miscellaneous section of the petitioner's master file was a set of inmate created[16] forms dated January 7, 1996. Pet's Exh. 23. The forms include: 1) an inmate created Form 1, signed by the petitioner and dated January 7, 1996; 2) an inmate created Form 3 signed by the petitioner and dated January 7, 1996; 3) an inmate created Form 4 signed by the petitioner and CT Page 487 dated January 7, 1996; 4) and an inmate created letter titled "Request for Final Disposition" signed by the petitioner and dated January 7, 1996. These forms were considered improper by the records department and they were not processed. TranscriptII, pp. 31-32.
D. FOURTH REQUEST
On January 22, and January 29, the petitioner submitted written requests asking the DOC records department, with regards to his New Jersey matter, to "make out all the court papers I need, so I can take care of this matter as soon as possible."Joint Exh. 26; Joint Exh. 24. In response to this request, Forms 1 through 4 were prepared by DOC personnel and provided to the petitioner. Transcript I, p. 39. Form 1 is dated January 30, 1996, is signed by Warden Deveau, but is not signed by the petitioner. Joint Exh. 27. Form 2 is dated January 30, 1996 and is signed by the petitioner. Form 3 is filled out and signed by the warden, although it is not dated, and Form 4 is filled out but not signed by the warden. The forms were submitted to the records office for processing and were placed in section 4 of the inmate's master file. Transcript I, p. 43; Transcript II, p. 36. The forms were not forwarded by the records department to New Jersey because the petitioner failed to sign Form 1. TranscriptI, p. 49; Transcript II, p. 36. Neither were the forms sent to and received by the DOC's IAD office. Transcript I, p. 41.
Also in his central file was a February 12, 1996 inquiry directed to the records office. Joint Exh. 37. The inquiry stated that he had contacted records a week prior regrading his New Jersey case. He asked records to "look into this matter." There was no official action taken in response to this request by the petitioner. Transcript II, p. 70.
E. FIFTH REQUEST; MOTION TO DISMISS
On July 24, 1996, the New Jersey's Attorney General's Office received directly from the petitioner a motion to dismiss the New Jersey charges for failure to prosecute and a Connecticut Speedy Trial Notification Request for Disposition form, filled out and dated 1995. Joint Exh. 36; Joint Exh. 32.
F. REQUEST FOR TEMPORARY CUSTODY
On October 21, 1996, the Interstate Compact Office received CT Page 488 New Jersey's request for temporary custody of the petitioner (Form 5). Joint Exh. 28.
 III.
In a habeas corpus proceeding the burden of establishing grounds for relief rest with the petitioner. Biggs v. Warden,26 Conn. App. 52, 55, 597 A.2d 839, cert. denied, 221 Conn. 902,600 A.2d 1029 (1991). The petitioner in the action at bar, has moved for a writ of habeas corpus, claiming that the State of Connecticut and the state of New Jersey failed to comply with their obligations set forth in the Interstate Agreement on Detainers an agreement to which both states are parties. The provisions of the IAD are activated once a charging state lodges with the custodial state a detainer based on a pending information, indictment or complaint. Giardino v. Bourbeau,193 Conn. 116, 124, 475 A.2d 298 (1984). The IAD establishes "procedures for the transfer of a prisoner in one jurisdiction to the temporary custody of another jurisdiction." General statutes § 54-186 et seq.; Cuyler v. Adams, 449 U.S. 443,101 S.Ct. 703, 66 L.Ed.2d 641 (1981); Giardino v. Bourbeau, supra,193 Conn. 124. The procedures "encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." General statutes § 54-186, Article I. Specifically, "the Detainer Agreement establishes two procedures under which the prisoner against whom a detainer has been lodged may be transferred to the temporary custody of the receiving state. One of the procedures may be invoked by the prisoner; the other by the prosecuting attorney of the receiving [s]tate.
"Article III of the Agreement provides the prisoner-initiated procedure. It requires the warden to notify the prisoner of all outstanding detainers and then to inform him of his right to request final disposition of the criminal charges underlying those detainers. If the prisoner initiates the transfer by demanding disposition (which under the Agreement automatically extends to all pending charges in the receiving [s]tate), the authorities in the receiving [s]tate must bring him to trial within 180 days or the charges will be dismissed with prejudice absent good cause shown.
"Article IV of the Agreement provides the procedure by which the prosecutor in the receiving [s]tate may initiate the CT Page 489 transfer. First, the prosecutor must file with the authorities in the sending [s]tate written notice of the custody request, approved by a court having jurisdiction to hear the underlying charges. For the next 30 days, the prisoner and the prosecutor must wait while the Governor of the sending [s]tate, on his own motion or that of the prisoner, decides whether to disapprove the request. If the Governor does not disapprove, the prisoner is transferred to the temporary custody of the receiving [s]tate where he must be brought to trial within 120 days of his arrival. Again, if the prisoner is not brought to trial within the time period, the charges will be dismissed with prejudice, absent good cause shown." (Internal citations omitted.) (Emphasis in original.) Cuyler v. Adams, supra, 449 U.S. 444. However, before the prisoner may be delivered to the temporary custody of the receiving state, he is entitled to a pre-transfer hearing at which he can bring a limited challenge to the receiving state's request for custody. Id., 449.
"Because the IAD is an interstate compact that the federal Congress has sanctioned, we must interpret its provisions in accordance with federal law. Carchman v. Nash, 473 U.S. 716, 719,105 S.Ct. 3401, 87 L.Ed.2d 516 (1985); Cuyler v. Adams, [supra,449 U.S. 438]; State v. Braswell, [194 Conn. 297, 304,481 A.2d 413, cert. denied, 469 U.S. 1112, 105 S.Ct. 793, 83 L.Ed.2d 786
(1984)]. In searching for the applicable federal law, we may, however, look to relevant decisions in both federal and state courts. State v. Braswell, supra." State v. Herring,210 Conn. 78, 85, 554 A.2d 686, cert. denied, 492 U.S. 912,109 S.Ct. 3230, 106 L.Ed.2d 579 (1989).
 IV.
A. ACTUAL COMPLIANCE
"It has been held that a prisoner must first meet the burden of compliance with IAD disposition procedures before he is entitled to invoke the agreement's benefits." Remick v. Lopes,203 Conn. 494, 505, 525 A.2d 502 (1987), citing Williams v. Stateof Maryland, 445 F. Sup. 1216, 1220 (D. Md. 1978); Gray v. Benson,443 F. Sup. 1284, 1286 (D. Kan. 1978); Beebe v. Vaughn, 430 F. Sup. 1220,1223-24 (D. Del. 1977); People v. Uplinger, 69 Ill.2d 181,183, 370 N.E.2d 1054 (1977). The petitioner claims that he "is entitled to quashal of the detainer pursuant to Article III and V of the interstate Agreement on Detainers by reason of his compliance with the statutory requirements [of the IAD]." PET'SCT Page 490MEM., p. 3. Article III(b) of the IAD directs that all requests by inmates for a speedy disposition of charges be "promptly forward[ed] . . . to the appropriate prosecuting official and court." General Statutes § 54-186. This is accomplished by the proper filing of Forms 1 and 2 drafted by the National Association of Extradition Officials' Administrative Directive 4.10. Transcript I, pp. 17-18. The petitioner claims that on five separate occasions he attempted to invoke his speedy trial rights under the IAD. On each occasion the petitioner alleges that he filled out paperwork for "prompt forward[ing]" to the appropriate officials and or forwarded such paperwork himself. However, a review of the pertinent facts shows that the petitioner did not comply with IAD procedures.
From the day the petitioner was notified about the existence of the detainer on August 29, 1990, he failed to comply with IAD procedure. He refused to sign Form 1 acknowledging that he had been notified of the existence of the detainer in accordance with IAD, Article III(c). Over the next six years the petitioner continued to ignore IAD procedures. Twice in 1992, the petitioner requested the proper IAD paperwork. When it was presented to him, he refused to sign it. Joint Exh. 7. In January of 1993 the petitioner mailed an undated, unofficial request directly to the New Jersey Attorney General's Office. Joint Exh. 10. The IAD, however, directs that inmate requests "shall be given or sent . . . to the warden, commissioner of correction or other official having custody of [the inmate]." General statutes §54-186, Article III(b). One year later in 1994, after being told by the New Jersey prosecutor the previous year to speak with a DOC official about proper IAD filing procedures, Joint Exh. 10, the petitioner again ignored IAD procedure and filed motions directly with the Atlantic Superior Court. Joint Exh. 32.
In April of 1995 the petitioner asked for the proper IAD forms so that he could file for speedy disposition. However, when the Forms 1 and 2 were presented to him he again refused to sign the forms. Joint Exh. 12; Joint Exh. 13. Instead, the petitioner filled out a Connecticut form used by Connecticut defendants to request speedy disposition of Connecticut charges. Joint Exh. 16.
This form is not one of the forms prescribed by the National Association of Extradition Officials for use in requesting speedy disposition of foreign charges. Transcript I, pp. 17-18, 33-34. Furthermore, because it is a form used by criminal defendants in Connecticut cases it may be a form that is totally unfamiliar to DOC and New Jersey officials. In May of 1995, the petitioner CT Page 491 again sent paperwork directly to the New Jersey Attorney General's Office. Not only was the direct mailing in violation of IAD Article III(b), but the forms themselves contained incorrect names and dates.[17]
In early January of 1996 the petitioner filled out two additional sets of IAD Forms 1 and 2. The forms, however, were not given to custodial officials as directed by IAD Article III(b). They were filed, on the request of the petitioner, in the miscellaneous section of his DOC file. Transcript II, pp. 30-31. Not only did the petitioner fail to file the forms properly, but the forms themselves were not in order. Some of the forms were signed, others were not. They all contained the name of warden Matos who was no longer the warden in 1996. Joint Exh. 19; JointExh. 21. Then at the end of January, the petitioner again requested that he be given the necessary IAD paperwork for filing for speedy disposition. And again, the petitioner refused to sign the Form 1 acknowledging that he had been properly notified of the existence of the detainer as required by Article III(c) of the IAD. Joint Exh. 24; Joint Exh. 26; Joint Exh. 27.
In July of 1996 the petitioner again ignored IAD procedure and filed a motion to dismiss directly with the Atlantic Superior Court. He also attached to his motion a copy of the April 1995 Connecticut request for speedy trial form. Joint Exh. 32; JointExh. 36.
None of the actions taken by the petitioner can be said to have been compliant with IAD procedure. The petitioner's direct filings violated the very language of IAD, Section III. His filing of paperwork in the miscellaneous section of his central file was a stumbling block to proper processing of the paperwork as was his filing of improper forms. Finally, his refusal to fill out the proper paperwork was antithetical to invoking the statutes protections.
B. SUBSTANTIAL COMPLIANCE
The petitioner claims in the alternative, that if this court finds that the petitioner did not actually comply with the IAD, then this court should find that he substantially complied with the requirements of the IAD. In support of his petition for a writ of habeas corpus the petitioner advances the following argument; that his substantial compliance claim warrants recognition based on the negligent and/or malicious conduct of CT Page 492 the New Jersey and Connecticut officials. And, because he substantially complied, the petitioner claims that the 180-day time period provided for by Article III of the IAD, should run from when "he took reasonable steps to `cause to be delivered' his request," not when he caused to be delivered his request. (Emphasis added.) PET'S MEM., p. 19.
In support of his claim that the 180 day time period should being running from the time "he took reasonable steps to cause to be delivered his request" the petitioner relies upon Schofs v. Warden,509 F. Sup. 78 (E.D. Ky. 1981); State v. Wells,186 N.J. Super. 497, 453 A.2d 236 (App.Div. 1982) and State v. Seadin, 181 Mont. 294, 593 P.2d 451
(1979). While it is true that earlier decisions of courts were split on when the 180 day period begins, the majority of courts, including the United States Supreme Court; Fex v. Michigan, 507 U.S. 43,113 S.Ct. 1085, 122 L.Ed.2d 406 (1993); and the Second Circuit; UnitedStates v. Paredes-Batista, 140 F.3d 367 (2nd Cir. 1998); have held that the period begins to run once the request is actually received by the appropriate court and prosecutor. Birdwell v. Skeen,983 F.2d 1332 (5th Cir. 1993). "Because the IAD is an interstate compact that the federal congress has sanctioned [and] we . . . interpret . . . in accordance with federal law" this court finds the law of the Supreme Court and Second Circuit control the issues in this case, not the law of New Jersey, Montana and Kentucky.[18] In 1993 the United States Supreme Court defined the IAD, Article III language "within one hundred and eighty days after he shall have caused to be delivered" his request, and the court interpreted it literally. U.S. v. Paredes-Batista, supra, 140 F.3d 374. Though the petitioner argues otherwise, Fex v.Michigan, supra, 507 U.S. 43, controls the facts of this case.
The petitioner in Fex v. Michigan, was brought to trial, on charges alleged in a detainer, 177 days after his speedy disposition request reached the Michigan officials, but 196 days after he gave his request to the prison authorities in Indiana where he was in custody. Fex v. Michigan, supra, 507 U.S. 43. Fex argued that the burden of compliance with IAD procedures should be entirely on law enforcement officials because prisoners lack the power to enforce compliance. Id., 52. The Supreme Court, after considering the potential "worst-case scenarios," rejected Fex's argument. The Court acknowledged that "a warden through negligence or even malice, [could] delay forwarding of the request, and thus postpone the starting of the 180 day clock." However, the prospect of a "a prisoner's IAD request [being] CT Page 493 delivered to the prosecutor more than 180 days after it was transmitted to the warden [such that] the prosecution [could] be precluded even before the prosecutor even [knew] it [had] been requested" was of greater concern to the Court. Id., 49-50. The Court dismissed the petitioner's "fairness" and "higher purpose" arguments as "more appropriately addressed to the legislature of the contracting states, which adopted the IAD's text." Id., 52. The Fex Court held, "that the 180 day time period in Article III(a) of the IAD does not commence until the prisoner's request for final disposition of the charges against him has actually been delivered to the court and the prosecutingofficer of the jurisdiction that lodged the detainer againsthim." (Emphasis added.) Id.; see also United States v. Paredes-Batista, supra, 140 F.3d 375 (holding that the 180 day time period does not begin to run until "actual receipt of the request by the court and prosecutor of the jurisdiction filing the detainer" and that the "actual delivery rule is not to be trumped by `fairness' arguments").
The petitioner, Pinto, claims that the Supreme Court holding in Fex "does not limit the relief available [in this case] as [Fex] [is] limited to its inapposite facts, and, none of the policy reasons for the holding in Fex apply to the facts of the case at bar." PET'S MEM., p. 3. This is clearly not the case. Though the facts may be inapposite, the holding is not. The Supreme Court stated unequivocally that "the 180 day time period in Article III(a) of the IAD does not commence until theprisoner's request has actually been delivered to the court andprosecuting officer of the jurisdiction that lodged the detainer against him." Fex v. Michigan, supra, 507 U.S. 52. The holding was not limited to situations absent negligence or malice on the part of the custodial officials. Id., 49-50. The holding did not say that the 180 day period would begin with actual delivery so long as the policy concerns addressed in the decision had not been met. In fact, the court rejected "fairness" and "higher purpose" arguments as better addressed to the legislature. Id., 52.
Even if this court were to find that public policy concerns were relevant to the disposition of these issues, this Court would nevertheless deny the petitioner's request for a writ of habeas corpus. It is the opinion of this court that the petitioner engaged in obstructionist tactics with the hope of ultimately avoiding prosecution in New Jersey. From August of 1990, when the petitioner first learned of the detainer, until October 1996, when New Jersey sought temporary custody of him, CT Page 494 the petitioner's alleged desire for a speedy disposition varied from day to day. He requested paperwork and then refused to sign it. He mailed documents directly to New Jersey, some of which contained altered names and dates. It was not the job of DOC and New Jersey officials to "analyze each communication from [the petitioner] with a fine-tooth comb to determine whether it should be construed as invoking the IAD." State v. Stiles,558 A.2d 1333 (N.J.Super. A.D. 1989).
The first three counts of the petitioner's complaint are rejected.
 V.
The petitioner's final claim is that "pursuant to Article V of the IAD the charge pending in New Jersey is subject to dismissal for failure to bring him to trial within 120 days of New Jersey's request for temporary custody which was received in Connecticut no later than October 21, 1996." The Connecticut Supreme Court has held that Article IV of the IAD regulates inmate transfers pursuant to foreign prosecutorial requests for temporary custody. General Statutes § 54-186. According to section (c) of Article IV, "trial [of the inmate] shall be commenced within 120 days of the arrival of the prisoner in thereceiving state. . . ." (Emphasis added.) The petitioner in this case never arrived in New Jersey for trial. He never arrived because he was never transferred for trial. In fact, when he was called before the court for his pre-transfer hearing the petitioner objected to the transfer and the court stayed the transfer for 60 days to allow the petitioner to file for a writ of habeas corpus. Thus, the petitioner's fourth count lacks any merit and is summarily rejected.[19]
 VI.
Because the petitioner has failed to substantiate his petition for writ of habeas corpus he is subject to extradition pursuant to New Jersey's Request for Temporary Custody (IAD Form V). The petitioner's petition for a writ of habeas corpus having been denied, the only issues properly before the court are: "(a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive from justice." Michigan v. Doran, 439 U.S. 282, 289, CT Page 49599 S.Ct. 530, 58 L.Ed.2d 521 (1978); accord Giardino v. Bourbeau, supra, 193 Conn. 122.
The petitioner was granted a pre-transfer hearing which was held on January 30 and March 20 1998. Transcript I and II. The petitioner, Augustus Pinto, attended the hearing. The petitioner did not challenge the propriety of the respondent's filing for a writ of habeas corpus, or of the pre-transfer hearing. Both the New Jersey detainer and Request for Temporary Custody were introduced as joint exhibits without objection by the petitioner.Joint Exh. 2; Joint Exh. 28. Thus, this court finds that the petitioner is the person named in the request for extradition, he has been charged with a crime in New Jersey, the documents from New Jersey are in order and the petitioner is a fugitive.Michigan v. Doran, supra, 439 U.S. 289; Giardino v. Bourbeau, supra, 193 Conn. 122.
 ORDER
It is hereby ordered that:
 1) the inmate Pinto's petition for a writ of habeas corpus and motion to quash the New Jersey detainer is dismissed.
 2) the respondent shall comply with Article IV and V of the Interstate Agreement on Detainers, C.G.S. § 54-186, in transferring temporary custody of the petitioner to the appropriate authorities of state of New Jersey.
Zarella, J.